UNITED STATES of America,

v.

**Stanley SIMON, Mario Biaggi, Peter Neglia, John Mariotta, Bernard Ehrlich, Richard Biaggi and Ronald Betso, Defendants.**

No. S 87 Cr. 265 (JMC).

United States District Court, S.D. New York.

July 10, 1987.

Robert D. Sack, Mitchell A. Karlan and Richard J. Tofel, Gibson, Dunn & Crutcher, New York City, for Dow Jones & Co., Inc.

Robert L. Raskopf, Townley & Updike, New York City, for Newsday, Inc.

Deborah R. Linfield, New York City, for New York Times Co.

Douglas P. Jacobs, New York City, for CBS, Inc.

Roberta Brackman, New York City, for Nat. Broadcasting Co., Inc.

Marjorie T. Coleman and Theodore Hadjiparaskevas, New York City, for New York News, Inc.

Nancy Brown and David Schultz, Rogers & Wells, New York City, for Associated Press.

Rudolph W. Giuliani, U.S. Atty., and Mary T. Shannon, Asst. U.S. Atty., for the U.S.

Maurice N. Nessen and David Z. Seide, Kramer, Levin, Nessen, Kamin & Frankel, New York City, for Stanley Simon.

Barry I. Slotnick, Slotnick & Baker, New York City, for Mario Biaggi.

Kevin P. McGovern, Brooklyn, N.Y., for Peter Neglia.

Jeffrey Glekel, Skadden, Arps, Slate, Meagher & Flom, New York City, for John Mariotta.

Peter Driscoll, Kostelanetz & Ritholz, New York City, for Bernard Ehrlich.

Dominic Amorosa, New York City, for Richard Biaggi.

Alan Kaufman, Buchwald & Kaufman, New York City, for Ronald Betso.

New York Civil Liberties Union, Arthur Eisenberg, New York City, for amicus curiae.

## MEMORANDUM & ORDER

CANNELLA, Senior District Judge:

Before the Court is an application by Dow Jones & Company, Inc., The New York Times Company, CBS, Inc., National Broadcasting Company, Inc., New York News Inc., The Associated Press and

Newsday, Inc. ["applicants"] to vacate this Court's Order of April 23, 1987 ["April 23 Order" or "Order"]. As it now stands, the Order directs defendants, their counsel, the United States Attorney and his representatives to respond to inquiries from the public communications media with the statement "No comment," or "Whatever we have to say will be said or has been said in court."[1]

A brief history of the events leading up to the April 23 order will assist the reader in placing the instant application in proper context. On April 1, 1987, former Bronx Borough President Stanley Simon was indicted on six counts of extortion, obstruction of justice, perjury and tax evasion. The charges stemmed from the ever-burgeoning investigation of the Wedtech Corporation ["Wedtech"]. At a pretrial conference held on April 10, the Court established tentative discovery and trial dates. Maurice Nessen, Esq., counsel for Stanley Simon, then read into the record the contents of a letter he had sent to the United States Attorney.[2] The letter spelled out the terms of a proposed stipulation regarding extrajudicial statements. After the letter had been read, the Court asked whether the Government would have any difficulty with the terms of the stipulation. The United States Attorney responded in the negative.[3] Following these discussions, the Government informed the Court and Mr. Nessen that it would be seeking a superseding indictment naming an unspecified number of additional defendants.

Several days later, upon the Government's refusal to execute the stipulation, Mr. Nessen submitted to the Court a proposed order embodying its terms. By letters dated April 16 and April 23, the Government opposed entry of the order. The Government argued that it had never consented to the specific terms of the proposed order and that such terms were inappropriate insofar as they exceeded the scope of Local Criminal Rule 7, to which the Government already considered itself bound.[4]

---

1. A copy of the April 23 Order is attached to this Memorandum and Order as an Appendix.

2. Mr. Nessen read the contents of a letter addressed to Assistant United States Attorney Mary T. Shannon:

"As I said in my telephone conversation just a while back today, I should like you and [United States Attorney Rudolph Giuliani] to agree to an interim lawyer's agreement to be spelled out to the Court tomorrow for its approval....

"The Government, or any organization of people associated with the that is [sic] collectively the Government, and the defendant and all his representatives, ... shall not, until the court rules on a motion to be addressed to pretrial publicity under Rule 7(c) of the Criminal Rules of the Southern District and Eastern District ... make any extra-judicial statement to any person associated with the public communications media or to any person to whom they would reasonably expect to communicate any statement to public communications media in regard to this case, the indictment or any proposed or actual superseding indictment or any facts relating to them, prospective witnesses, Mr. Simon or the functioning of the Government in this case, other than statements made in open court and made in papers filed in court....

"All comments of the Government and defendant to questions by anybody associated with public communications media or people likely to disseminate what is said to them shall be confined to a statement of 'no comment' or 'Whatever we have to say ... will be said or has been said in court.'"
Transcript of April 10, 1987 Pre-Trial Conference at 6–7.

3. After Mr. Nessen completed his reading of the letter, the following discussion took place:

THE COURT: Maybe we have no problem. Do you have any trouble with this? I don't have any trouble with the [proposed order]. I don't know why you should.
MS. SHANNON: No, your Honor.
THE COURT: Then we have no problem, right? We'll sign a stipulation and that's it.
MR. NESSEN: Great, your Honor.
Transcript of April 10, 1987 Pre-Trial Conference at 8.

4. In its letter of April 16, 1987, addressed to Mr. Nessen, the Government argued that it was in full compliance with Local Criminal Rule 7 and "saw no reason to sign a stipulation which requires the Government to do what it is already bound to do." "Moreover," the Government continued, "the proposed stipulation was presented to us and the Court as a stipulation under Rule 7. In fact, however, it is broader in scope than anything set forth in the Rule. As such, we believe that the proposed stipulation is particularly inappropriate."

In its letter of April 23, 1987, the Government stated that "Mr. Simon [had] mischaracterized the Government's position presented at the pre-

The Court entered the proposed order on April 23 after considering the extent of both pre-indictment and post-indictment publicity regarding Mr. Simon, the numerous media accounts of an anticipated superseding indictment and the charges likely to be contained therein,[5] the Government's April 10 in-court consent to the terms of the proposed order and the lack of any cognizable prejudice to the Government.

On June 3, the grand jury investigating Wedtech returned a superseding indictment containing 58 counts and naming six additional defendants: New York Congressman Mario Biaggi, John Mariotta, Peter Neglia, Bernard Ehrlich, Richard Biaggi and Ronald Betso. On June 5, all defendants named in the superseding indictment were arraigned, with the exception of Bernard Ehrlich. On that date, the Court stated from the bench that the terms of the April 23 Order were being extended to all participants for the duration of the case.[6] During these proceedings, an attorney representing applicant Newsday, Inc. asked to be heard regarding the Order. Newsday was invited by the Court to make a written submission regarding its concerns.

On June 12, a hearing was held concerning the April 23 Order. All parties expressing an interest were provided an opportunity to present their views. First and foremost, the Court polled the individual defendants regarding their positions. Five defendants, Stanley Simon, John Mariotta, Peter Neglia, Bernard Ehrlich and Richard Biaggi expressed support for continuation of the Order; defendants Mario Biaggi and Ronald Betso took no position.[7] Representatives of the applicants, along with a representative of the New York Civil Liberties Union ["NYCLU"] were heard, as was counsel for Mr. Simon. At the conclusion of the hearing, the Court invited further written submissions,[8] granted the request of the representatives of the media to have their submissions considered an application to vacate the April 23 Order and reserved decision.

## DISCUSSION

### I. STANDING OF APPLICANTS

Applicants are members of the print and broadcast public communications media. At the June 12 hearing, there was some discussion concerning what standing, if any, applicants might possess to challenge an order restraining defendants, their counsel and the United States Attorney ["trial participants"] from making extrajudicial statements when, except for the Government, none had objected to the terms of the Order and no direct restraint had been imposed on applicants or any other newsgathering organization. Applicants have more thoroughly addressed this issue in their written submissions.

Applicants argue that they have standing to challenge the Order because of "[(1)] the free speech right with respect to the persons 'gagged' and [(2)] the free press right of the applicants to gather news for dissemination to the public." Applicants

---

trial conference held on April 10, 1987, as well as the scope of Rule 7."

5. *See, e.g.,* the exhibits attached to the following: Affidavit of Maurice N. Nessen in Support of the Proposed Order, 87 Cr. 265 (JMC) (filed S.D.N.Y. April 17, 1987); Affidavit of Maurice N. Nessen In Support of Motion Seeking Criminal Contempt Proceedings ["Motion"], 87 Cr. 265 (JMC) (filed S.D.N.Y. May 28, 1987); Supplemental Affidavit of Maurice N. Nessen In Support of Motion, 87 Cr. 265 (JMC) (filed S.D.N.Y. June 1, 1987); Second Supplemental Affidavit of David Z. Seide In Support of Motion, 87 Cr. 265 (JMC) (filed S.D.N.Y. June 9, 1987); Reply Affidavit of Maurice N. Nessen, 87 Cr. 265 (JMC) (filed S.D.N.Y. June 22, 1987).

6. *See* Transcript of June 5, 1987 (arraignment of Stanley Simon) at 3; Transcript of June 5, 1987 (arraignment of Mario Biaggi) at 6.

7. *See* Transcript of June 12, 1987 at 21–22.

8. The Court has received and considered the following submissions from applicants: Letter of June 8, 1987 (Newsday, Inc., The New York Daily News, Dow Jones & Co., Inc., Associated Press, National Broadcasting Co., Inc. and CBS, Inc.); Letter of June 10, 1987 (The New York Times Company); Memorandum of Law In Support of Application to Vacate April 23 Order, 87 Cr. 265 (JMC) (filed S.D.N.Y. June 22, 1987) (on behalf of all applicants); Letter of June 26, 1987 (on behalf of Newsday, Inc.). In addition, the New York Civil Liberties Union submitted a 12 page position letter, dated June 15, 1987.

argue that they possess standing "separately to assert *both* rights." Memorandum In Support of Application To Vacate April 23 Order at 5, 87 Cr. 265 (JMC) (filed S.D.N.Y. June 22, 1987) ["Memorandum of Applicants"] (emphasis in original).

### A. *The First Amendment and the Individuals Restrained*

██ Applicants first claim standing to challenge the April 23 Order on account of the "free speech" rights of the individuals restrained by it. As nonparties, which are not subject to the Order, however, applicants do not possess standing to assert the First Amendment rights of the individuals who are subject to the Order. *See Radio & Television News Assn. v. U.S. District Court,* 781 F.2d 1443, 1448 (9th Cir.1986); *Levine v. U.S. District Court,* 764 F.2d 590, 594 (9th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 2276, 90 L.Ed.2d 719 (1986); *see also Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978). This is especially true where, as here, the individuals restrained have not themselves challenged the Order, or otherwise asserted any infringement of their First Amendment rights.[9]

Applicants' challenge is more precisely premised upon an alleged infringement of their First Amendment "right to receive" or "right to listen to" the speech of those individuals restrained by the Order. In support of this first prong of their standing argument, applicants cite the case of *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *see also Richmond Newspapers, Inc. v.*

*Virginia,* 448 U.S. 555, 559 n. 2, 100 S.Ct. 2814, 2818 n. 2, 65 L.Ed.2d 973 (1980) (Stewart, J., concurring in judgment) (the "right to speak implies a freedom to listen").

In *Virginia State Board,* the Supreme Court struck down a statute declaring it unprofessional conduct for a pharmacist to advertise the prices of prescription drugs. On the issue of standing, the Court found that a consumer group not directly affected by the statute had standing to challenge it on First Amendment grounds because "a right to advertise ... [creates] a reciprocal right to receive the advertising," which may then be asserted by such potential recipients. *Id.* 425 U.S. at 757, 96 S.Ct. at 1823.[10]

Under *Virginia State Board,* it is clear that when an individual desires to speak but is restrained, the potential recipients of that message have standing to challenge the restraint. *See id.* at 756–57, 96 S.Ct. at 1822–23; *see also Kleindienst v. Mandel,* 408 U.S. 753, 762–63, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972) (citing cases). However, it seems equally clear that "[f]reedom of speech [and the reciprocal right to receive that speech] *presupposes a willing speaker." Virginia State Board,* 425 U.S. at 756, 96 S.Ct. at 1823 (emphasis added). Of the seven defendants and their counsel in this case, none have objected to or otherwise challenged the April 23 Order in any respect. Indeed, five of the seven defendants openly support the restraints and the remaining two have taken no position. Only the Government has opposed the Order, primarily on the ground that it is not warranted by the circumstances.[11]

---

**9.** While it is true that the Government objects to the Order, the Court believes that of the three separate groups subject to the restraints (Government, defendants, defense counsel), the Government is most susceptible to supervision by the Court. *See infra* text at II, D, 3. The Court also notes that subsequent to voicing support for the Order at the June 12 hearing, defendant Mariotta communicated to the Court by letter dated June 15, expressing his "strong[ ] support" for the restrictions imposed by the Court.

**10.** Of course, in *Virginia State Board,* only the First Amendment was implicated. No balancing between the protections afforded thereunder and the Sixth Amendment's guarantee of a fair trial was necessary.

**11.** In a one paragraph letter, dated June 12, 1987, the Government informed the Court that it opposed the Order and "largely concur[red]" with the constitutional analysis proffered by applicants. Also, at the June 12 hearing, the Government suggested that the April 23 Order was "impractical" and had impeded communi-

■ In the Court's view, a potential recipient of speech faces a two-step hurdle before he may successfully challenge, on First Amendment grounds, a restraint on the right of others to speak. First, his right to receive speech becomes cognizable only when an individual has indicated a willingness to speak and is being restrained from doing so. *See Virginia State Board,* 425 U.S. at 756, 96 S.Ct. at 1822. Under such circumstances, the potential recipient would have standing to challenge the restraint. Even then, however, the challenge may be defeated if the restraints imposed upon the putative speaker are within the limits permitted by the Constitution. Thus, the potential recipient's rights are entirely derivative of those of the speaker.

■ Accordingly, applicants stand in a rather precarious position, given the tenuous availability of speech for which protection is sought. As noted, defendants and their counsel have expressed an unwillingness to speak. Indeed, all but two have, in effect, sought the Court's protection from the predictable prodding that often accompanies press efforts in the earnest search for news. Nonetheless, because the Order might ultimately restrain some speech, despite defendants' current positions, applicants possess standing as potential recipients to challenge the restraints insofar as they may be unconstitutional with respect to the speakers.

### B. *The First Amendment and Freedom of the Press*

Applicants assert a "separate" ground upon which they claim to possess standing to challenge the April 23 Order. This ground is the so-called First Amendment "right to gather and report the news." Upon examination, however, there appears to be little, if any substantive difference between this second prong of applicants' standing argument and the first.

Some courts have characterized the First Amendment's protection for freedom of the press as encompassing a right to gather news. *See, e.g., CBS, Inc. v. Young,* 522 F.2d 234, 238 (6th Cir.1975) ("The protected right to publish the news would be of little value in the absence of sources from which to obtain it."); *National Broadcasting Co., Inc. v. Cooperman,* 116 A.D.2d 287, 289, 501 N.Y.S.2d 405, 406 (2d Dep't 1986) (per curiam) (citing *CBS, Inc. v. Young, supra* ); *cf. Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated.") (dictum); *Richmond Newspapers, Inc.,* 448 U.S. at 583, 100 S.Ct. at 2830 (Stevens, J., concurring in opinion of Burger, C.J.) ("[A]rbitrary interference with access to important information is an abridgement of the freedoms of speech and of the press."); *id.* at 599 n. 2, 100 S.Ct. at 2839 n. 2 (Stewart, J., concurring in judgment) ("The right to publish implies a freedom to gather information.") (citing *Branzburg, supra* ).

■ The Court has no difficulty with the notion that the right to gather and report news is encompassed within the protections afforded under the First Amendment. The issue raised by the instant application, however, involves the constitutional contours of that right and the extent to which First Amendment protection may be used as both shield and sword by members of the media. Applicants' argument is essentially that, by placing restrictions on potential sources of news, the April 23 Order infringes their right to gather and report

cations between it and potential targets of the Wedtech investigation and their counsel. *See* Transcript of June 12, 1987 at 55–56. The Court finds this representation utterly without merit or foundation. The terms of the Order quite clearly limit the parties from making extrajudicial statements to members of a public communications media or "to any person whom they would reasonably expect to communicate any statement to a public communications media." How those communications mentioned by the

Government could in any way be construed to violate the April 23 Order is unclear. In any event, between April 23 and June 3, the date the superseding indictment was returned, the Government made no application to the Court for a modification of the Order for the purpose of carrying on the communications described above. The Government did find it fitting, however, to seek modification of the Order to allow for a press conference announcing the return of a superseding indictment.

newsworthy information. *See CBS, Inc.,* 522 F.2d at 237–38; *Cooperman,* 116 A.D.2d at 289, 501 N.Y.S.2d at 406. It is the Court's view, however, that this argument has validity only where the public is entitled to the information to which applicants seek access.

The First Amendment "grants the press no right to information about a trial superior to that of the general public," *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 609, 98 S.Ct. 1306, 1318, 55 L.Ed.2d 570 (1978), nor does it "guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg,* 408 U.S. at 684, 92 S.Ct. at 2658; *see also Zemel v. Rusk,* 381 U.S. 1, 16–17, 85 S.Ct. 1271, 1280–1281, 14 L.Ed.2d 179 (1965); *Radio & Television News Assn.,* 781 F.2d at 1446–47. The media is "granted access [only] to the same information, but nothing more, that is available to the public." *Id.* at 1447; *cf. Pell v. Procunier,* 417 U.S. 817, 834, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974) ("[N]ewsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public."). If a district court "determine[s] that the free speech of the trial counsel must be restrained, the media has no greater right than the public to hear that speech." *Radio & Television News Assn.,* 781 F.2d at 1447.

█ Thus, so long as the restraints imposed upon the trial participants in this case are within constitutional boundaries, applicants possess no separate or "special" right of access to the restrained individuals or speech. *See Branzburg,* 408 U.S. at 684–85 ("Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded, and they may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal."). In *Zemel v. Rusk,* the Court noted that:

> There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right.

381 U.S. at 16–17, 85 S.Ct. at 1281.

Applicants' right to gather and report the news, therefore, is not distinct, in substantive First Amendment terms, from their general right to receive speech discussed above. Where there are no willing speakers, or where constitutionally permissible restrictions on freedom of expression are imposed, the media has no "special" right to obtain such information. *See Branzburg,* 408 U.S. at 684, 92 S.Ct. at 2658; *Warner Communications, Inc.,* 435 U.S. at 609, 98 S.Ct. at 1318; *Levine,* 764 F.2d at 594. Due to the nature of their business, it is perhaps understandable that applicants wish to question and prod the individuals subject to the Order, intending thereby to extract a response. But when the sought after speakers are unwilling to speak, or their speech is restrained constitutionally, the media's right to gather news does not mushroom into an unqualified right to badger and cajole for the purpose of obtaining access to information to which the general public is not otherwise entitled. *See, e.g., Saxbe v. Washington Post Co.,* 417 U.S. 843, 850, 94 S.Ct. 2811, 2815, 41 L.Ed.2d 514 (1974) ("The proposition 'that the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally ... finds no support in the words of the Constitution or in any decision of the Court.'") (quoting *Pell v. Procunier,* 417 U.S. at 834–35, 94 S.Ct. at 2810); *Zemel,* 381 U.S. at 17, 85 S.Ct. at 1281 ("The right to speak and publish does not carry with it the unrestrained right to gather information."); *see also Central South Carolina, Society of Professional Journalists v. Martin,* 431 F.Supp. 1182, 1187 (D.S.C.), *aff'd as modified,* 556 F.2d 706 (4th Cir.1977), *cert. denied,* 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 771 (1978).

In constitutional terms, therefore, applicants' right to gather news is no more than a right of access to the same information to which the general public is entitled access, accompanied by a right to distill and disseminate that information to those members of the public willing to pay for such a service. *See Warner Communications, Inc.*, 435 U.S. at 609, 98 S.Ct. at 1318 ("Since the press serves as the information-gathering agent of the public, it [cannot] be prevented from reporting what it [learns in court records open to the public] and what the public [is] entitled to know."); *Richmond Newspapers, Inc.*, 448 U.S. at 586 n. 2, 100 S.Ct. at 2832 n. 2 (Brennan, J., concurring in judgment) (The media's "right of access is at least equal to that of the general public.... As a practical matter, however, the institutional press is the likely, and fitting, chief beneficiary of a right of access because it serves as the 'agent' of interested citizens, and funnels information about trials to a large number of individuals."); *Estes v. Texas*, 381 U.S. 532, 541–42, 85 S.Ct. 1628, 1632, 14 L.Ed.2d 543 (1965) ("The public has the right to be informed as to what occurs in its courts, ... reporters ... are plainly free to report *whatever occurs in open court.*") (emphasis added); *id.* at 589, 85 S.Ct. at 1663 ("Once beyond the confines of the courthouse, a news-gathering agency may publicize, within wide limits, what its representatives have heard and seen in the courtroom. But the line is drawn at the courthouse door; and within, a reporter's constitutional rights are no greater than those of any other member of the public.") (Harlan, J., concurring); *see also Radio & Television News Assn.*, 781 F.2d at 1443; *Levine*, 764 F.2d at 594.

Accordingly, the Court holds that applicants have standing to challenge the April 23 Order to the extent that it might, in the future, unconstitutionally restrain willing speakers, or otherwise deprive the general public of information to which it is entitled. In this light, the Court shall address the constitutionality of the restrictions imposed by the Order.

## II. THE CONSTITUTION AND PREJUDICIAL PRETRIAL PUBLICITY

### A. *An Overview*

■ At the outset, the Court recognizes that the task of balancing the rights and interests enshrined in the First and Sixth Amendments is a difficult one:

The balance that should be struck is between First Amendment rights, the Sixth Amendment rights of the accused, and the public's expectation that the trial will be fair and before an impartial jury. This sort of delicate balancing should be undertaken reluctantly; but when provoked by attorneys, whether prosecutors or defenders, who seek by use of the press to obtain as partial a jury as possible, courts must respond.

*Levine*, 764 F.2d at 603 (Sneed, J., concurring). The public has a fundamental right to be informed about events which transpire in the course of a criminal trial. *See Richmond Newspapers, Inc.*, 448 U.S. at 575–80, 100 S.Ct. at 2826–29; *Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947) ("A trial is a public event. What transpires in the court room is public property."). The Court agrees that, "[w]ith respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492, 95 S.Ct. 1029, 1044–45, 43 L.Ed.2d 328 (1975). Of course, nothing in the April 23 Order prevents applicants from covering courtroom events, or reporting on matters of public record, nor does it place any restriction whatsoever on what applicants may publish or broadcast.[12]

At least equal to, if not more fundamental than, the right of the public to be informed, however, is the central theory of our judicial system that "the conclusions to

---

**12.** In this sense, the restraints imposed by the April 23 Order are not as severe as those involved in *Nebraska Press Assn.* (restraints on publication) or *Richmond Newspapers, Inc.* (trial closed to media).

be reached in a [criminal] case [must] be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907) (Holmes, J.). "Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice." *Pennekamp v. Florida*, 328 U.S. 331, 347, 66 S.Ct. 1029, 1037, 90 L.Ed. 1295 (1946); *See Estes*, 381 U.S. at 540, 85 S.Ct. at 1631 (The "atmosphere essential to the preservation of a fair trial—the most fundamental of all freedoms—must be maintained at all costs.")

## B. *Responsibility of the Court*

[8] It is the responsibility of this Court to guarantee defendants a fair trial by impartial jury.[13] In exercising this responsibility, it is the Court's duty to take affirmative steps "to insure the fairness of a criminal proceeding in the face of excessive publicity." *Levine*, 764 F.2d at 596; *see Farr v. Pitchess*, 522 F.2d 464, 468–69 (9th

Cir.1975), *cert. denied*, 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1203 (1976); *see also Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Hirschkop v. Snead*, 594 F.2d 356, 366 n. 8 (4th Cir.1979) (en banc) ("The language of the [Supreme] Court [in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)] is more nearly directive than suggestive.").

In *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the Supreme Court reversed a state court murder conviction on the ground that the defendant had been deprived of his Sixth Amendment right to a fair trial due to prejudicial pretrial publicity. Although the factual circumstances in *Sheppard* were especially egregious, the fundamental principles established in that case are still with us today and are unquestionably relevant to any analysis regarding the constitutionality of measures taken by a trial court to eliminate prejudicial pretrial publicity. Interestingly enough, in not one of applicants' submissions to the Court is the *Sheppard* case discussed or even mentioned.

---

**13.** Of course, this responsibility is not similarly shouldered by members of the press. Nevertheless,

> The extraordinary protections afforded by the First Amendment carry with them something in the nature of a fiduciary duty to exercise the protected rights responsibly—a duty widely acknowledged but not always observed by editors and publishers. It is not asking too much to suggest that those who exercise First Amendment rights in newspapers or broadcasting enterprises direct some effort to protect the rights of an accused to a fair trial by unbiased jurors.

*Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 560, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976).

At the June 12 hearing, counsel for applicants pointed to the recent acquittal of former Labor Secretary Raymond Donovan in arguing that fair trial rights can be protected despite extensive publicity and that such publicity, without more, does not justify restraints on freedom of expression. *See* Transcript of June 12, 1987 at 33, 40–41. Applicants' argument misses a significant point.

In addition to its constitutional responsibility in protecting the right to a fair trial on the part of individual defendants, the Court must also concern itself with protecting systemic values considered indispensable to the fair administration of justice. For example, following his acquittal, former Labor Secretary Donovan asked

rhetorically where he might go to have his reputation restored to him. Mr. Donovan's plaintive plea stemmed at least in part from what he perceived to be a politically-motivated prosecution built upon a non-existent evidentiary foundation. But Mr. Donovan also predicted, correctly it seems, that the publicity surrounding his acquittal was going to be *de minimis* compared with that accompanying his indictment and the early stages of trial. Under circumstances similar to those confronted by Mr. Donovan, lingering notions about an acquitted defendant's character, and even his innocence may remain embedded in the public's collective memory. Apart from the impact these notions may have upon an acquitted defendant's life, employment prospects and stature in the community, such residual effects help to undermine public confidence in the judicial system.

In the aftermath of a celebrated trial, members of the public may come to believe that certain defendants were acquitted not because of their innocence, but rather, because of a prosecutor's incompetence or tactical error, the fame or oratorical skill of defense counsel, or even because of vaguely understood concepts of the "legal technicality" through which an otherwise guilty individual escapes the grasp of justice. These potential implications of extensive publicity are ones which the courts and responsible members of the media must consider in performing their respective duties.

In *Sheppard*, the Supreme Court took issue with the failure of the trial judge to more effectively control both pretrial publicity, and the conduct of the press at the trial itself. *See id.* at 356–63, 86 S.Ct. at 1518–22. The Court wrote that "[e]ffective control of [prejudicial news] sources-concededly within the court's power—might well have prevented the divulgence of inaccurate information, rumors, and accusations that made up much of the inflammatory publicity." *Id.* at 361, 86 S.Ct. at 1521. The Court went further:

> More specifically, the trial court *might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters,* such as the refusal of Sheppard to submit to interrogation or take any lie detector tests; any statement made by Sheppard to officials; the identity of prospective witnesses or their probable consequences; any belief in guilt or innocence; or like statements concerning the merits of the case.

*Id.* (emphasis added).

In concluding, the Court declared that "where there is *a reasonable likelihood* that prejudicial news prior to trial will prevent a fair trial," the trial court should take measures to prevent such an occurrence. *Id.* at 363, 86 S.Ct. at 1522 (emphasis added). "[T]he cure lies in those remedial measures that *will prevent the prejudice at its inception....* Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, *but is highly censurable and worthy of disciplinary measures."* *Id.* at 363, 86 S.Ct. at 1522 (emphasis added).

The principles of *Sheppard* were discussed at length by the Judicial Conference's Committee On the Operation of the Jury System, chaired by Judge Irving Kaufman. *See Report on the "Free Press-Fair Trial" Issue,* 45 F.R.D. 391 (1968) ["Kaufman Report"]; *see also Freedom of the Press and Fair Trial: Final Report with Recommendations* (1967) (report by the Special Committee on Radio, Television, and the Administration of Justice of the

Association of the Bar of the City of New York, chaired by Judge Harold R. Medina). The Kaufman Report recommended that "[i]n a widely publicized or sensational case, the Court, on motion of either party or on its own motion, may issue a special order governing such matters as extrajudicial statements by parties and witnesses likely to interfere with the rights of the accused to a fair trial by an impartial jury." 45 F.R.D. at 409. The Report concluded that a special order might include "[a] proscription of extrajudicial statements by participants in the trial, including lawyers, parties, witnesses, jurors, and court officials, which might divulge prejudicial matter not of public record in the case." *Id.* at 409–10 (citing *Sheppard,* 384 U.S. at 361, 86 S.Ct. at 1521).

Of course, the recommendations found in the Kaufman Report, which specifically relied upon and quoted the *Sheppard* case as authority, were eventually embodied in this District's Local Criminal Rule 7. Local Rule 7(a) specifically forbids lawyers in a criminal case from making extrajudicial statements concerning "the identity, testimony or credibility of prospective witnesses" or "[a]ny opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case." These very categories of extrajudicial statements were among those described in *Sheppard* as "divulg[ing] prejudicial matters." 384 U.S. at 361, 86 S.Ct. at 1521. These are the very statements which, in the proper case, a trial court may "proscribe[ ] any lawyer, party, witness, or court official from making." *Id.*

*Sheppard* has never been abandoned nor its principles diluted by the Supreme Court in subsequent cases. On the contrary, its recommendations for preventive measures regarding prejudicial publicity have been cited and discussed approvingly in some of the cased cited by applicants. *See Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 563–64, 96 S.Ct. 2791, 2804–05, 49 L.Ed.2d 683 (1976); *Branzburg,* 408 U.S. at 685, 92 S.Ct. at 2658; *see also In re Russell,* 726 F.2d 1007, 1009–11 (4th Cir.), *cert. denied,* 469 U.S. 837, 105 S.Ct. 134, 83 L.Ed.2d 74 (1984); *In re Application of National*

*Broadcasting Company, Inc.,* 635 F.2d 945, 951 (2d Cir.1980); *United States v. Tijerina,* 412 F.2d 661, 666–67 (10th Cir.), *cert. denied,* 396 U.S. 990, 90 S.Ct. 478, 24 L.Ed.2d 452 (1969).

■ Under *Sheppard* and its progeny, this Court is required to take those steps reasonably calculated to prevent the dissemination of prejudicial publicity. One such step is to proscribe prejudicial extrajudicial statements by lawyers and other participants in the case. As the Court has previously acknowledged, the April 23 Order as it now stands is overbroad, *see* Transcript of June 12, 1987 at 39, in that it prohibits *all* comments concerning the case. Such a sweeping prohibition includes factual statements and descriptions of pending motions or other matters of public record for which there can be no reasonable likelihood of prejudicial impact. Accordingly, in modifying the Order, the Court considers those restraints which are permitted under the First Amendment.

## C. *Permissible Restraints on Pretrial Publicity*

In *Nebraska Press Assn.,* the Supreme Court held that before placing a prior restraint on *publication,* a trial court must examine "(a) the nature and extent of pretrial news publicity; (b) whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity; and (c) how effectively a restraining order would operate to prevent the threatened danger." 427 U.S. at 562, 92 S.Ct. at 2804.

## 1. *The Nature and Extent of Pretrial Publicity*

Applicants argue that before any prior restraints may be placed on freedom of expression, specific findings must be made that the expression "restrained poses either a clear and present danger or a serious and imminent threat to a protected competing interest." Memorandum of Applicants at 8. A few courts have taken this or like position in striking down prior restraints of speech in criminal cases. *See, e.g., CBS, Inc.,* 522 F.2d at 239; *Chicago Council of Lawyers v. Bauer,* 522 F.2d

242, 249 (7th Cir.1975); *Chase v. Robson,* 435 F.2d 1059, 1061 (7th Cir.1970) (per curiam).

However, in upholding prior restraints, other courts have utilized a lesser and in the Court's view, more realistic standard, that of a reasonable likelihood that the activity restrained might result in an unfair trial. *See, e.g., Central South Carolina Chapter,* 431 F.Supp. at 1188 (approving "reasonable likelihood" standard, although finding, on the facts of the case, a "substantial likelihood" of prejudice to fair trial rights), *aff'd as modified on other grounds,* 556 F.2d 706 (4th Cir.1977), *cert. denied,* 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 771 (1978); *Tijerina,* 412 F.2d at 666; *Cooperman,* 116 A.D.2d at 292, 501 N.Y.S.2d at 408 (" 'reasonable likelihood' of a serious threat to a defendant's right to a fair trial"); *see also Report of the Ad Hoc Hoc Committee on Pretrial Publicity* at 5 (Association of the Bar of the City of New York, April 1987) ("reasonable likelihood of a serious threat to a particular defendant's right to a fair trial") ["Ad Hoc Committee Report"].

The starting point for analysis in this area must be governing Supreme Court precedent. The Supreme Court has never held that proscriptions on extrajudicial statements which might be prejudicial require specific findings of a "serious and imminent threat" to a fair trial. *Sheppard* speaks only of a "reasonable likelihood that prejudicial news prior to trial will prevent a fair trial." 384 U.S. at 363, 86 S.Ct. at 1522; *see Tijerina,* 412 F.2d at 666. In addition, conclusions "as to the impact of [prejudicial) publicity on prospective jurors [are] of necessity speculative, dealing [as they do] with factors unknown and unknowable." *Nebraska Press Assn.,* 427 U.S. at 563, 96 S.Ct. at 2804.

■ When a trial court finds extensive and pervasive pretrial publicity, it may "reasonably conclude, based on common human experience, that [such] publicity *might* impair the defendant's right to a fair trial." *Id.* Nothing more is required. It is specious to suggest that, in light of the standards announced in *Sheppard* and *Ne-*

braska Press Assn., the Court must make "specific factual findings" as to how defendants are being or will be prejudiced. Prejudice to the defendants due to extensive *pretrial* publicity will occur at the time *of trial,* not before. "[G]iven the pervasiveness of modern communications and the difficulty of *effacing prejudicial publicity from the minds of . . . jurors,"* Sheppard, 384 U.S. at 362, 86 S.Ct. at 1522 (emphasis added), it will then be too late for this Court to ensure defendants a trial free of prejudicial taint. Accordingly, the Court "must take strong measures to ensure that the balance [between the First Amendment's protections of freedom of expression and the Sixth Amendment's guarantee of a fair trial] *is never weighed against the accused." Id.* (emphasis added).

This case is at the vortex of a large-scale Government investigation into the affairs of the Wedtech Corporation. The nationwide investigation being conducted focuses on Wedtech's involvement with various Government agencies and public officials. An independent counsel has been appointed and the Attorney General of the United States is himself under investigation. In evaluating the publicity surrounding and impacting upon this case, the Court cannot ignore the larger sea from which it was spawned.

.Furthermore, the history of this case points up what the Court can only describe as a shameful abuse of grand jury secrecy. Extensive publicity and media speculation predated the indictment of Stanley Simon in early April. Following Mr. Simon's indictment and continuing up to the return of the superseding indictment on June 3, there was massive publicity concerning the targets of the ongoing grand jury investigation, the allegations being presented before the grand jury, and in some instances the identities and testimony of witnesses before the grand jury.[14] All of these apparent "leaks" occurred despite the April 23 Order.

■ Given the sensational nature of this case, the egregious pattern of grand jury leaks, the involvement of two prominent, elected public officials, the near certainty that any statements made by the trial participants would be widely publicized, the extensive media coverage of the continuing investigation into the affairs of Wedtech and the inherent difficulty of effacing prejudicial associations from the minds of prospective jurors,[15] the Court

---

**14.** For example, one article quotes a "well-placed source" as saying New York Senator Alfonse D'Amato had been "a valuable asset for the prosecution" in the investigation of Congressman Biaggi. The article went on to say that the same source expected Senator D'Amato to be a witness at the trial. *See* Weiss, "D'Amato Helped Wedtech Probe Team Nail Biaggi," New York Post, June 6, 1987.

**15.** The Court finds highly persuasive the reasoning of the Federal District Court in *Central South Carolina Chapter, Society of Professional Journalists v. Martin,* 431 F.Supp. 1182 (D.S.C.), *aff'd as modified,* 556 F.2d 706 (4th Cir.1977), *cert. denied,* 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 771 (1978), and hereby adopts such reasoning as its own. In denying the request of news-gathering organizations to vacate its order placing restrictions on prejudicial extrajudicial statements, the court wrote:

Prior to entering the [restraining order], from the Court's reading of various newspapers within the State . . . and watching and listening to reports on the broadcast media, this Court took notice of the widely publicized and sensational nature of the criminal case against [the defendant], a state senator, and his co-defendants. The publicity was and remains extensive as can readily be evidenced by the collected newspaper clippings presented by the plaintiffs in this action . . . and this collection represents only a portion of the total continuing publicity. The Court has also taken notice of the numerous and extraordinary inquiries made by representatives of the press and news media to this Court concerning this particular criminal case. The Court has also taken notice, that the information contained in the media reports contrary to the assertions of the plaintiffs, is unrestrained and often of a prejudicial nature and would be inadmissible evidence at a trial. All such information, particularly prejudicial information, that is widely disseminated has the effect of making more difficult the selection of an impartial jury. *Selection becomes particularly more difficult when statements of trial participants in particular are widely published. Thus in widely published or sensational cases, where the statements of trial participants are likely to appear in a widely disseminated manner, there is a substantial likelihood that prospective jurors are unwittingly exposed to statements constituting prejudicial inadmissi-*

finds that an unrestrained field of attorneys and defendants would add enough fuel to an already voracious fire of publicity to create, at the very least, a real and substantial likelihood that some, if not all, defendants might be deprived of a fair trial.[16]

### 2. *Less Restrictive Alternatives*

The second factor the Court must consider is whether less restrictive alternatives would ensure the defendants a fair trial. *See Nebraska Press Assn.* 427 U.S. at 563–64, 96 S.Ct. at 2804–05. Such measures might include a change of venue, postponement, searching voir dire, sequestration and emphatic instructions to the jurors. With the exception of a change of venue and sequestration, all of these measures will need to be taken regardless of the April 23 Order.

### (i) *Postponement*

The trial date has already been postponed in order to give defense counsel more time to adequately prepare. While in some cases, a postponement might serve to quell public interest in and press coverage of a particular matter, such a waning of coverage is unlikely in the instant case. The Government's investigation into Wedtech is continuing and press accounts concerning it appear almost daily. A number of other indictments stemming from this investigation are expected and will, of course, engender substantial additional publicity. Given these circumstances, it is unlikely that an additional postponement will effectively reduce the publicity surrounding this particular case, or that publicity concerning the Wedtech investigation generally will abate anytime in the near future.

### (ii) *Voir Dire, Jury Instructions and Sequestration*

Regardless of what occurs in the months between now and the onset of trial, prospective jurors will have to be questioned extensively about their exposure to the publicity surrounding this case. There exists the view that "years of *voir dire* experience [has] disclosed that a very substantial number of prospective jurors do not read the papers or listen to the nightly news and that if they do, they do not remember anything of importance by the time trial arrives." Ad Hoc Committee Report at 5 (paraphrasing the view expressed by United States Attorney Rudolph Giuliani and Harvard Law Professor Alan Dershowitz at a forum sponsored by the Association of the Bar of the City of New York on October 28, 1985).

The argument that most jurors ultimately selected in highly publicized cases have little recollection of pretrial news reports concerning the case does not persuade the Court that judicial vigilance over the dissemination of prejudicial extrajudicial statements should be relaxed. In the Court's view, absence from the jury of individuals who read daily newspapers and keep abreast of newsworthy developments is simply not the best of all possible worlds, especially in a lengthy and complex criminal case where decisions regarding guilt or innocence will often require painstaking attention to evidentiary detail. *See generally Levine,* 764 F.2d at 600 ("It is not in the parties' interest or in the interest of justice to exclude from the jury all citizens who read the Los Angeles Times or who otherwise keep abreast of current events.").

Moreover, in a case of this kind, jurors will need to be given emphatic instructions

---

*ble evidence that would jeopardize the defendants' right to a fair trial.* To the extent that the Court has authority, it is the duty of the Court to prevent that kind of jury prejudice. 431 F.Supp. at 1189, *aff'd as modified on other grounds,* 556 F.2d 706 (4th Cir.1977), *cert. denied,* 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 771 (1978) (emphasis added).

**16.** Even as this Memorandum and Order is being prepared for filing, its rationale is fortified by an event which occurred on July 8, 1987. It involves a statement by Congressman Biaggi's attorney, made in response to a reporter's question, which the Government now seeks to introduce against Mr. Biaggi at a trial to be held before Judge Weinstein in the Eastern District of New York. This clearly demonstrates the great harm that can befall parties to a litigation from remarks made randomly, off-the-cuff or based on speculation, rather than after reflection and proper preparation.

to disregard any publicity to which they had been exposed, regardless of the extent of such exposure. Jury instructions alone, however, are not always an adequate remedy where a trial has been infected with extensive pretrial publicity. *See id.* at 600; *Silverthorne v. United States,* 400 F.2d 627, 643 (9th Cir.1968); *Issacson, Fair Trial and Free Press: An Opportunity for Coexistence,* 29 Stan.L.Rev. 561, 566–67 (1977).

Sequestration of jurors is a drastic remedy, which cannot be recommended lightly. As the court in *Levine* noted, "sequestration is an undesirable alternative. Jurors, especially in long trials, should not bear the brunt of counsels' transgressions. Moreover, the resentments and ... harassment which derives from sequestration can often impede calm and rationale deliberation." 764 F.2d at 600 (adopting district court's rationale for rejecting sequestration alternative).

Moreover, the Court notes that these alternative measures are of the "palliative" variety discussed in *Sheppard.* The "cure," wrote the Court, is in preventing dissemination of prejudicial matter in the first instance. 384 U.S. at 363, 86 S.Ct. at 1522. Reasonable restraints, imposed at this stage and narrowly tailored to the censure of prejudicial statements, to which potential listeners have no right of access, are certainly far more desirable from both a judicial and societal standpoint than direct restraints on the publication of prejudicial extrajudicial statements. *See Nebraska Press Assn.,* 427 U.S. at 601, 96 S.Ct. at 2823 (Brennan, J., with Stewart and Marshall, JJ., concurring in judgment) (Trial court should "stem much of the flow of prejudicial publicity *at its source, before*

it is obtained by representatives of the *press.*") (emphasis added); *Sheppard,* 384 U.S. at 363, 86 S.Ct. at 1522 ("[R]emedial measures [must be taken] that will prevent the prejudice at its inception."); *see also Levine,* 764 F.2d at 600–01; *Application of National Broadcasting Co., Inc.,* 635 F.2d 945, 951 (2d Cir.1980); *Farr v. Pitchess,* 522 F.2d 464, 468 (9th Cir.1975) ("The most practical and recommended procedure to insure against dissemination of prejudical information is the entry of an order directing that attorneys, ... and witnesses refrain from releasing any information which might interfere with the right of the defendant to a fair trial."), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1203 (1976).

### 3. *Effectiveness of the Restraint*

The last of the *Nebraska Press Assn.* factors involves an examination of whether the restrictions will be effective in achieving the desired results. The April 23 Order has already had a salutary effect in this case. It has negated any characterization of the defendants or the offenses with which they are charged.[17] Defense counsel have been able to focus their attentions on trial preparation, rather than engaging in combative discourse with members of the press. Likewise, defendants have been able to prepare for trial and otherwise carry on with their lives in a less frenzied atmosphere.

### D. *The Individuals Restrained*

#### 1. *Defendants*

 Defendants have not objected to the April 23 Order. Indeed, five defend-

---

17. An egregious example of this type of conduct occurred at the June 3 press conference announcing the return of the superseding indictment. United States Attorney Rudolph Giuliani announced that this Court's Order of June 1 allowed the press conference to go forward with "the principal restriction being that no one should be characterizing these charges except to state what's in the indictment and what's on the public record." Following this statement, Bronx District Attorney Mario Merola made the following remarks:

Ladies and Gentlemen, I am very happy to be here and to be ... part of something which I perceive to be probably the largest corruption, criminal investigation, probably in the history of the nation. It crosses city lines, it crosses state lines, it crosses federal lines. Also it has its tentacles in Puerto Rico and probably in Hawaii.... I suspect that the bottom line is that corruption or greed has no bias.

Exhibit 1, Reply Affidavit of Maurice N. Nessen, 87 Cr. 265 (JMC) (filed S.D.N.Y. June 22, 1987) (Transcript of June 3, 1987 Press Conference Announcing Superseding Indictment).

ants openly support the Order and two take no position. In the Court's view, this fact lessens the burden which must be met in justifying restraints on defendants, although, as discussed above, the Court believes that under *Sheppard* and its progeny, it is empowered to impose such restraints.

The Court also deems it significant that this is a multi-defendant criminal case. Without restraints imposed uniformly on all defendants, one might choose to make a statement or respond to persistent questioning from members of the press. If such statements were of a prejudicial nature, the rights of other defendants (or even the rights of the individual defendant himself) might be seriously compromised.

In addressing this issue in its submission to the Court, the NYCLU writes: "[R]ather than the imposition of a restraining order upon *unwilling* defendants, a more desirable approach would be to require that defendants reach some sort of accord with respect to what they will say to the press or whether they will say anything. Defendants can, of course, decline to talk to the press. And upon this logic, ... they could also enter into a stipulation in which they agree not to talk to the press." Letter of NYCLU at 9 n. 12 (S.D.N.Y. June 15,

1987) (emphasis added). Apart from the obvious misstatement in this letter to the effect that defendants are "unwilling" to have restraints placed on their freedom of expression, the Court does not believe there is any substantive difference between the suggestion offered by the NYCLU and the circumstances in which the defendants currently find themselves. Accordingly, so long as no individual defendant challenges the restraints, the Court shall subject all defendants to them.

### 2. *Defense Counsel*

The discussion found in the main body of this Memorandum and Order apply to those restraints upon defense counsel countenanced by the First Amendment and shall not be repeated here.[18] Moreover, the Court notes that, like the individual defendants, no defense counsel has objected to or otherwise challenged the Order.

### 3. *The United States Attorney*

 It is a duty of the prosecution "to seek justice and not merely to convict, to refrain from discussing pending criminal cases except as to matters of record." Ad Hoc Committee Report at 11.[19] In this regard, the Supreme Court has stated:

---

**18.** *See* §§ II, A–C *supra.* Of course, "[a]s officers of the court, ... attorneys have a fiduciary responsibility not to engage in public debate that will redound to the detriment of the accused or that will obstruct the fair administration of justice." *Nebraska Press Assn.,* 427 U.S. at 601 n. 27, 96 S.Ct. at 2823 n. 27 (Brennan, J., concurring in judgment). "It is very doubtful that the court would not have the power to control release of information by these individuals in appropriate cases." *Id.; see In re Sawyer,* 360 U.S. 622, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959).

**19.** The Department of Justice has detailed guidelines concerning the release of information related to pending criminal proceedings. The guidelines admonish that:

At no time shall personnel of the Department of Justice furnish any statement or information for the purpose of influencing the outcome of a defendant's trial, nor shall personnel of the Department furnish any statement or information, which could reasonably be expected to be disseminated by means of public communication, if such statement or information may reasonably be expected to influ-

ence the outcome of the pending or future trial.

28 C.F.R. § 50.2(b)(2) (1984).

Disclosures should be limited to areas such as the age, employment and marital status of defendants, *see, e.g., id.* § 50(b)(3)(i) or "[t]he substance or text of the charge, such as a complaint, indictment, or information." *Id.* § 50(b)(3)(ii). Moreover, Government prosecutors are further admonished that

Disclosures should include *only incontrovertible, factual matters, and should not include subjective observations.* In addition, where background information relating to the circumstances of an arrest or investigation would be highly prejudicial or *where the release thereof would serve no law enforcement function, such information should not be made public.*

*Id.* § 50.2(b)(3)(iv) (emphasis added).

Perhaps most telling, especially in light of the position taken by the Government in this case, is the Department's determination that

Because of the *particular danger of prejudice* resulting from statements in the period approaching and during trial, they *ought strenuously to be avoided* during that period. Any

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape nor innocence suffer.

*Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

Prosecutors "may be subjected in gag orders to more stringent restraints than are defense counsel." *Levine,* 764 F.2d at 602 (Sneed, J., concurring); NYCLU Letter at 8–11; Federal Bar Council Committee on Second Circuit Courts, *Reports on the Permissible Scope of Extrajudicial Statements of Attorneys in Federal Criminal Cases* 11 (April 1987); Arkin, *Self Defense By the Defense—Publicity, Fair Trial,* N.Y.L.J., June 11, 1987, at 2. The Government simply has no legitimate basis to demand a free hand in speaking to the press about this case if its extrajudicial statements go beyond matters contained in the indictment or already part of the public record. *See United States v. Alberico,* 604 F.2d 1315, 1320 n. 15 (10th Cir.) ("The prosecution is not free to release or say whatever it wishes about pending cases."), *cert. denied,* 444 U.S. 992, 100 S.Ct. 524, 62

L.Ed.2d 422 (1979). As Justice Frankfurter once wrote:

To have the prosecutor himself feed the press with evidence that no self-restrained press ought to publish in anticipation of a trial is to make the State itself, through the prosecutor who wields the power, a conscious participant in trial by newspaper, instead of by those methods which centuries of experience have shown to be indispensable to the fair administration of justice.

*Stroble v. California,* 343 U.S. 181, 201, 72 S.Ct. 599, 609, 96 L.Ed. 872 (1952) (Frankfurter, J., dissenting).

### E. Summary

■ As modified, the Court's Order will prohibit those statements and comments which the Supreme Court, in *Sheppard,* found to be prejudicial per se. As such, at least in highly publicized cases, the proscription of statements concerning the merits of the case, the character of the defendants, the identity or credibility of potential witnesses, or the quality or content of evidence, *see* 384 U.S. at 361, 86 S.Ct. at 1521, is both a duty of the trial court and constitutional per se. Such statements have no place in an adjudicative process which permits "no one [to] be punished for a crime without 'a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, [or] excitement.'" *Id.* at 350, 86 S.Ct. at 1516 (quoting *Chambers v. Flor-*

such statement or release shall be made only on the infrequent occasion when circumstances *absolutely demand disclosure of information and shall include only information which is clearly not prejudicial.*
*Id.* § 50.2(b)(5) (emphasis added).
The Government's position in this case is even more surprising given the Department of Justice's conclusion that "[t]he release of certain types of information *generally tends to create dangers of prejudice without serving a significant law enforcement function." Id.* § 50.-2(b)(6) (emphasis added). Not surprising, these categories of information, the release of which "personnel of the Department should refrain from making," *id.,* are essentially derived from *Sheppard* and include "[o]bservations about a defendant's character," *id.* § (6)(i), "[s]tatements concerning the identity, testimony, or credibility of prospective witnesses," *id.* § (6)(iv), "[s]tatements concerning *evidence or argument in the*

*case, whether or not it is anticipated that such evidence or argument will be used at trial," id.* § (6)(v), or "[a]ny opinion as to the accused's guilt," *id.* § (6)(vi).
In D. Gillmore, *Free Press and Fair Trial* 39–40 (1966), the author discusses a memorandum written by then-United States Attorney for the Connecticut District, Jon O. Newman in December 1964. According to Gillmore, the memorandum "prohibit[ed] [federal prosecutors] from making disclosures to the press involving prospective evidence, statements of witnesses, reports of investigative agencies, and opinions as to the guilt of the accused persons." *Id.* at 39. Gillmore's work quotes the memorandum as stating: "Close questions as to what may appropriately be disclosed are to be resolved against disclosure and in favor of protecting the accused's right to a fair trial.... To put it simply, if in doubt, keep silent." *Id.* at 39–40.

*ida,* 309 U.S. 227, 236–37, 60 S.Ct. 472, 476–77, 84 L.Ed. 716 (1940)).

## CONCLUSION

For all of the foregoing reasons, it is hereby

ORDERED, that the United States Attorney and the District Attorney for Bronx County, their representatives and agents, defendants Stanley Simon, Mario Biaggi, John Mariotta, Peter Neglia, Bernard Ehrlich, Richard Biaggi and Ronald Betso, and their counsel and representatives SHALL NOT MAKE ANY extrajudicial statement concerning this case (1) to any person associated with a public communications media, or (2) that a reasonable person would expect to be communicated to a public communications media, except that nothing in this Order shall prohibit any individual from:

(A) Stating, without elaboration or characterization—

(1) the general nature of an allegation or defense;

(2) information contained in the public record;

(3) the scheduling or result of any step in the proceedings; or

(B) Explaining, without characterization, the contents or substance of any motion or step in the proceedings, to the extent such motion or step is a matter of public record.[20]

This Order supersedes all previous orders.[21]

SO ORDERED.

## APPENDIX

### Endorsement and Order

The Court having considered the annexed proposed order offered by defendant, as well as the Government's letter in response, dated April 23, 1987, and it appearing to the Court that this matter is "a widely publicized or sensational case" within the meaning of Local Criminal Rule 7(c), and it further appearing, from the annexed news clippings and others that have become known to the Court, that the general proscriptions of Rule 7 are not sufficient under these circumstances, and the Government having previously consented to the essential terms of the annexed proposed order at a pretrial conference held before the Court on April 10, 1987, and the Government having presented no legal or factual reason why entry of such an order will be prejudicial to its interests, it is

ORDERED, that pending a ruling on defendant's forthcoming motion addressed to

**20.** *See* Ad Hoc Committee Report at 8–9. In this part of its Report, the Committee proposed an amendment to the New York Code of Professional Responsibility's disciplinary rule regarding trial publicity (DR7–107(A)–(B). The proposed amendment explicitly exempted certain categories of speech from the general proscriptions. These categories have, in large measure, formed the basis for the exceptions listed in the Court's modified Order.

**21.** The Court's purpose in holding the June 12 hearing was threefold. First, applicants were allowed an opportunity to supplement their written submissions. Second, the Court sought to ascertain the positions of the defendants, their counsel and the Government regarding the scope of the April 23 Order. Third, the Court sought to elicit suggestions for alternatives to the Order's restrictions, which might satisfy the legitimate concerns of applicants, trial participants and the Court.

In the end, applicants could suggest nothing short of vacatur. Mr. Nessen, counsel for Stanley Simon, was similarly bereft of suggestions for alternative restrictions and urged that the Court retain the Order as it stood. Both sides argued that nothing short of their stated positions could adequately protect their respective rights. Thus, the Court was presented with the Hobson's choice of continuing a blanket restriction upon all statements concerning this case or abdicating its role as guarantor of defendants' Sixth Amendment rights by allowing unrestrained commentary, assuming, of course, willing speakers in the future. The Court has, instead, chosen a middle road.

Read in conjunction with this Memorandum, the Order provides clear guidance as to those categories of speech that are proscribed. Essentially, these categories are those discussed in *Sheppard* and subsequently embodied in Local Criminal Rule 7. *See* §§ II, B; II, E *supra*. In the Court's view, the entire range of legitimate speech concerning "this case" falls within the four categories of exceptions. Thus, as modified, the Order is neither overbroad in scope, nor unconstitutionally vague. *See, e.g., Smith v. Goguen,* 415 U.S. 566, 572–73, 94 S.Ct. 1242, 1246–47, 39 L.Ed.2d 605 (1974).

pretrial publicity, the parties shall abide the terms of the annexed proposed order.

It is So Ordered.

/s/ John M. Cannella
JOHN M. CANNELLA
United States District Judge

Dated:
New York, New York
April 23, 1987.

IT IS HEREBY ORDERED:

1. The United States of America and any organization or people associated with it (collectively "the government") and the defendant and all his representatives (collectively "defendant") shall not, until the Court rules on a motion to be addressed to pre-trial publicity under Rule 7(c) of the Criminal Rules of the Southern and Eastern Districts, make any extrajudicial statement to any person associated with a public communications media or to any person whom they would reasonably expect to communicate any statement to a public communications media in regard to: (i) this case, (ii) the indictment or any proposed or actual superseding indictment or any facts relating to them, (iii) prospective witnesses, (iv) Mr. Simon or (v) the functioning of the government in this case other than statements made in open court or made in papers filed in court.

2. All comments of the government and defendant to questioning by anybody associated with public communications media or people likely to disseminate what is said to them shall be confined to a statement of "no comment" or "whatever we have to say will be said or has been said in court."