**UNITED STATES of America,**

v.

**Marshall KING, Bruno Crutchfield, Michael D. Wilkins and Nelson Brown, Sr.**

**Crim. No. 3:00CR109.**

United States District Court,
E.D. Virginia,
Richmond Division.

May 8, 2000.

Michael C. Wallace, Asst. U.S. Attorney, Richmond, VA, for Government.

Matthew P. Geary, Richmond, VA, for Marshall King.

Michael Morchower, Morchower, Luxton and Whaley, Richmond, VA, for Bruno Crutchfield.

Charles A. Gavin, White, Blackburn & Conte, Richmond, VA, for Michael D. Wilkins.

S. Neil Stout, Flax, Embrey & Stout, Richmond, VA, for Nelson Brown, Sr.

## MEMORANDUM OPINION

PAYNE, District Judge.

The Indictment in this case charges the defendants with participating in a conspiracy to distribute cocaine base, possessing cocaine base, distributing cocaine base to two women in exchange for sexual favors, maintaining a crack house, and various firearms offenses. The defendant, Marshall King, has filed a Motion for Special Order Regarding Extrajudicial Statements in which he seeks an Order enjoining the Government's witnesses from making statements to the press or others so as to protect his right to a fair trial by an impartial jury as guaranteed by the Sixth Amendment of the Constitution of the United States. The motion, which was filed on May 4, 2000, recited that one of the Government's witnesses, an individual identified by name in several places in the Indictment, had been interviewed by a reporter for a local television station owned by Raycom Media, Inc. ("Raycom" or "Channel 6") and that Channel

6 intended to interview the witness live as part of a program about this case.

Raycom moved to intervene to protect its rights under the First Amendment. An evidentiary hearing and oral argument on the motion was held on May 5, 2000. Between the time that the motion was filed and the time of the hearing, counsel for the defendant learned that the witness already had been interviewed at length by a reporter for the television station and that Channel 6 intended to air parts of that interview, rather than to interview the witness again during the forthcoming program. Therefore, at the commencement of the hearing, the defendant made an oral motion that the Court enjoin Raycom from publishing any part of the previously given interview.

Also, at the commencement of the hearing, the defendants, Bruno Crutchfield and Michael Wilkins, joined the oral and written motion made by the defendant, King. The defendant, Nelson Brown, joined only the oral motion to restrain publication of the interview and opposed the entry of an order restraining Government witnesses from making statements to other people.

The text of the written motion asserts that it is made "with the consent and the concurrence of the United States." However, at the hearing, the United States reversed course and opposed the request for the restraint against publication of the interview on the television and the entry of an order enjoining witnesses from making extrajudicial statements about the case. Raycom took no position with respect to the request for an order enjoining witnesses from making extrajudicial statements but opposed any restraint on its publication of the interview.

For the reasons set forth below, the motion to restrain publication of the television interview is denied and the motion to enjoin Government witnesses from making extrajudicial statements is granted in part.

### STATEMENT OF FACTS

This federal case has its genesis in an indictment returned on October 22, 1999 by a State grand jury. The State indictment involved 40 charges against the four defendants here and one other individual.[1] The State charges included some of the same offenses charged in the federal indictment as well as various sex crimes such as aiding and abetting prostitution, criminal solicitation and crimes against nature. When the State indictments were made public, the Virginia State Police, which had coordinated the investigation leading to the State indictment, held a press conference announcing the fact of the indictment and newspaper and television coverage ensued. The defendants live and/or work in Mecklenburg County and Brunswick County or in the towns of Brodnax and South Hill and the events which gave rise to the charges in the Indictment are alleged to have occurred in that area. The record here discloses that there were at least ten newspaper articles following the return of the State indictment from the papers in those counties. (Def's.Exs.1, 3–9) Additionally, there were at least four television reports from Channel 6 and one other news channel. (Def's.Ex. 2)

The case attracted a burst of media attention largely because one of the defendants was a Virginia State Trooper, another was the Police Chief of Brodnax, Virginia in Brunswick County and another was a reasonably well-known businessman operating a funeral parlor in South Hill, Virginia. Further, the case also involved another person who allegedly was a well-known dealer in Mecklenburg County. Another obvious reason for the early publicity associated with the State indictment is that the allegations involved an alleged exchange of sex for drugs. The early print coverage gives considerable play to that aspect of the charges. And, that focus is replicated in the television coverage. Indeed, one of the features offered on October 28, 1999 by Channel 6, the intervenor here, bore the leading caption "High Bail For Sex Cops." (Def's Ex. 2).

For reasons which do not appear in the record, the federal authorities undertook fur-

---

1. The fifth individual indicted under the State indictment was not named in the federal indict-

ment.

ther investigation of the case and a federal grand jury returned the Indictment in this case on March 27, 2000. And that, in turn, generated another spate of newspaper and media coverage. For example, the *Richmond Times Dispatch* contained articles on March 30 and 31, 2000 reporting the fact of the federal indictment and the terms of pre-trial release for the defendants. (Def's.Ex. 1) Another television report appeared, again on Channel 6, on Friday, April 7, 2000, reporting on the arraignment of the defendants and the setting of a trial date. (Def's.Ex. 2) There may have been other publicity in newspapers in other parts of the state but a cursory search on the internet by the Court and the efforts of the defendants have identified no further publicity.

The parties have stipulated that the viewing area of Channel 6 is roughly coterminous with the boundaries of the Richmond Division of the Eastern District of Virginia. The offenses are alleged to have occurred within the Richmond Division of the Eastern District of Virginia. And, therefore, the trial is scheduled to be conducted in the courthouse of the Richmond Division before a jury drawn from the vicinage that is this division.

The motions currently before the Court arose when, on May 3, 2000, a reporter for Channel 6 telephoned one of the defense counsel to advise that she had prepared a program that addressed the allegations in this case and she reported that one of the witnesses had given a comprehensive interview. At the hearing, the reporter testified that she asked the witness for an interview and that the witness ultimately agreed. The witness is confined in state facilities serving a sentence on an unrelated charge. The reporter promised the witness to maintain her name and identity in confidence and to publish the interview only by masking the wit-

ness' appearance and voice. The reporter has abided by the promises that she made respecting confidentiality. The identity of the witness was obtained by virtue of the efforts of defense counsel and the United States Attorney and those efforts confirmed that the witness is one of the women named in the Indictment as having exchanged drugs for sex.

The reporter, Jean Ziliano, testified that she has prepared a substantial piece to be presented on Channel 6 on May 8 and 9, 2000, and, that, as a part of the work for that program, she interviewed the Government's witness for approximately 40 minutes. The program to be televised will feature only approximately 4 minutes of the 40 minute interview, although the remainder of the program could be considerably longer.[2] According to Ziliano, the segment of the tape to be aired contains a discussion of the allegations in the Indictment, admissions by the witness as to her own conduct, and an opinion of the witness respecting the truth of the allegations in the Indictment are true. However, according to Ziliano, the interview exceeds the substance of the allegations in the Indictment only marginally.

Upon the authority of *United States v. Noriega,* 917 F.2d 1543 (11th Cir.), *cert. denied* 498 U.S. 976, 111 S.Ct. 451, 112 L.Ed.2d 432 (1990), the Court ordered Raycom to produce the segment of the interview which will be aired as part of the program prepared by Ziliano. Although Raycom objected to production of the tape, it promptly complied with the Court's order and the Court viewed the segment of the interview to be aired.[3] Ziliano testified that the program will be accompanied by some form of graphic heading which, at the present, is planned to read something like the heading in defendants' Exhibit 2 "High Bail For Sex Cops."

---

2. The defendants do not seek to restrain publication of the entire program. Their motion is confined to the publishing of the interview given by the Government witness.

3. During the viewing, Ziliano advised that certain, somewhat graphic aspects of the statement will be edited and will not be shown. That decision was made by Ziliano and Channel 6 before the hearing in this case. Further, it is also important to note that Channel 6 may eliminate from the four minute segment of the interview to be aired certain other parts of the witness' statement. However, Channel 6 has represented, through counsel on the record, that none of the balance of the 40 minute interview will be added as part of the editing process. Hence, it was unnecessary to view any part of the interview other than the approximately four minutes which was eligible for airing as of the time of hearing.

Comparing the interview with the text of the Indictment, it is correct to say, as Ziliano testified, that the topics covered in the interview are also topics that appear in the Indictment. However, it is also true that the witness' statements address those topics in considerably greater detail and more graphically than do the allegations of the Indictment.

## DISCUSSION

Whether to impose a prior restraint on the publication of an article in the print media or a program, or part thereof, in the electronic media is governed by a different standard than whether it is appropriate to enjoin witnesses from making extrajudicial statements. Hence, each topic will be considered separately.

## I. Prior Restraint of the Interview of the Witness

As the Supreme Court has explained, "[f]ree speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them." *Bridges v. California*, 314 U.S. 252, 260, 62 S.Ct. 190, 86 L.Ed. 192 (1941). And, "[t]he authors of the Bill of Rights did not undertake to assign priorities as between First Amendment and Sixth Amendment rights, ranking one as superior to the other." *Nebraska Press Association v. Stuart*, 427 U.S. 539, 561, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). Having recognized that the authors of the Constitution "were unwilling or unable to resolve the issue by assigning to one priority over the other," the Supreme Court has made clear that "it is not for us [the Court] to rewrite the Constitution by undertaking what they declined to do." *Id.*

■ Prior restraint against publication in the press carries with it a "heavy presumption against its constitutional validity." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *see also Nebraska Press*, 427 U.S. at 569–70, 96 S.Ct. 2791. Our own Court of Appeals has construed the *Nebraska Press* opinion to mean that the proponent of a prior restraint order must show a "clear and present danger" that the pretrial publicity sought to be restrained will adversely affect the ability of the defendant to receive a fair trial. *Central South Carolina Chapter, Society of Professional Journalists, Sigma Delta Chi v. United States District Court for the District of South Carolina*, 551 F.2d 559, 562 n. 3 (4th Cir.1977), *cert. denied*, 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 771 (1978).

■ To ascertain whether a prior restraint of freedom of the press or speech is necessary to protect the fair trial rights of the defendant, the Supreme Court held in *Nebraska Press* that the court must "determine (a) the nature and extent of pretrial news coverage; (b) whether other measures would be likely to mitigate the effects of the unrestrained pretrial publicity; and (c) how effectively a restraining order would operate to prevent the threatened danger. The precise terms of the restraining order are also important." *Nebraska Press*, 427 U.S. at 562, 96 S.Ct. 2791. To that determination, we now turn.

## A. The Nature and Probable Extent of Publicity

To date, the publicity has not been extensive, notwithstanding that the case involves two law enforcement officers and the kind of salacious subject matter which ordinarily prompts extensive media coverage, both print and electronic. However, that appears largely to be the result of the fact that the trial date is some six weeks hence. The defendants adamantly describe the case as "sensational" and even Raycom's counsel described it as having a "high profile." All counsel and the reporter seem to think that media coverage can be expected to increase as the trial draws near. Indeed, the appearance of the segment for publication on May 8 and May 9 is thought likely to prompt additional coverage.

That view is confirmed by the experience in *United States v. Harris,* a case that concluded in this Court approximately a year ago in which the defendant was a noted political operative and the charges involved a drug conspiracy and the exchange of drugs for sex. In that case, the pretrial publicity

was so intense that the state authorities ceded jurisdiction to the federal authorities. Of course, under the Local Rules of this Court, lawyers are not free to discuss criminal cases in the press, and, therefore, the publicity, to some extent, dissipated until the trial approached at which time it began to once again proliferate. The experience in *United States v. Harris* is consistent with the generally true circumstance that the trial of cases involving a somewhat salacious matter attracts media attention. And, the record indicates that the same circumstance reasonably can be expected to occur here.

Further, the Court is obligated to consider not only the past publicity, but also to assess publicity likely to occur between the date of the motion and the date of jury selection, albeit the latter is a somewhat speculative undertaking. *See Nebraska Press*, 427 U.S. at 562–63, 96 S.Ct. 2791. Taking this record and previous experience into account, it is reasonable to conclude that this case will generate a substantial level of publicity to which the trial venire in this case reasonably can be expected to be exposed in their newspapers and on their television viewing channels.

The second component of this facet of the *Nebraska Press* test requires an assessment of whether the publicity is of the sort that might impair the defendant's right to a fair trial. In context of this case, that requires consideration of the text of the interview that is to be aired. As explained earlier, it is the intent of the television station to run two evening news programs on Monday, May 8 and Tuesday, May 9, and each of those programs will have approximately two minutes of interview time with the Government witness. The portion of the interview to be aired discusses no topic that is not set forth in a general fashion in the Indictment. However, the interview addresses those topics in more detail than is outlined in the Indictment; the witness provides her view, in a general way, about what the outcome of the trial should be; and, again in a most general way, the witness explains why she believes such an outcome is appropriate. Thus, it is fair to characterize the interview as containing some testimony that likely would be ad-

missible at trial and some statements which never would be admissible at trial. And, the interview statement, which is both explicit and salacious, reasonably can be described as of the type which will be difficult to efface from the imprint it makes on the minds of those who hear it.

It is, therefore, fair to say that the interview, although short, reasonably could be expected to have "some adverse impact on the attitudes of those who might be called as jurors." *Nebraska Press*, 427 U.S. at 569, 96 S.Ct. at 2807. However, it cannot be said that publication of this single interview "would so distort the views of potential jurors that 12 could not be found who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court." For that reason alone, the imposition of a prior restraint on publication of the interview would not be consistent with the constitutional strictures respecting the imposition of an order of prior restraint on publication by the press.

### B. Whether Other Measures Will be Likely to Mitigate the Affects of this Publicity

■ The alternatives to prior restraint of publication are set forth in *Sheppard v. Maxwell*, 384 U.S. 333, 357–62, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Those alternatives include: (a) change of trial venue; (b) postponement of the trial to allow public attention to subside; (c) searching questioning of prospective jurors to screen out those with fixed opinions as to guilt or to innocence or who cannot put aside the information to which they have been exposed in news coverage; (d) the use of emphatic and clear instructions at trial respecting the duty to decide the issues only on the basis of the evidence presented in open court; and (e) sequestration of the jurors to enhance the likelihood of dissipating the impact of publicity and to emphasize the importance of juror's oaths.

■ Having considered these alternatives, the current record permits the finding that appropriately searching voir dire examination and appropriate trial instructions are

sufficient to alleviate any prejudice that may ensue publication of this one interview. Hence, it is unnecessary to consider the other alternatives.

### C. The Probable Efficacy of Prior Restraint on Publication as a Workable Method of Protecting the Defendants' Right to a Fair Trial

This factor is rather obvious here because prior restraint would, in fact, completely protect against any impingement on the defendants' right to a fair trial because no juror would be exposed to the interview. The reporter and the television station are within the jurisdiction of the Court and, indeed, the television station is a party to these proceedings. Hence, if an order of prior restraint were otherwise appropriate, it would certainly be a workable method of protecting the defendants' right to fair trial.

Having considered the nature of the statement, the nature and extent of probable publicity, the probable impact of the statement on the jurors and the effectiveness of methods less drastic than prior restraint of publication of the single interview here, it is necessary to decline the request to impose a prior restraint on publication of the interview.

## II The Request for Restraint on Extrajudicial Statements by Witnesses

■ Persons who are witnesses in judicial proceedings also have the right of free speech. The United States Court of Appeals for the Fourth Circuit, in reliance upon the encouragement of the Supreme Court offered in *Sheppard* and *Nebraska Press*, has upheld orders which have "prohibited 'potential witness[es]' from discussing their proposed trial testimony with members of the media." *In Re Lacie Russell*, 726 F.2d 1007, 1008 (4th Cir.1984), *cert. denied*, 469 U.S. 837, 105 S.Ct. 134, 83 L.Ed.2d 74 (1984). Where the question is the propriety of restraining public statements by witnesses the test is whether there is "a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial." *Central South Carolina Chapter, Society of Professional Journalists, Sigma Delta Chi v. United States District Court for the District of South Carolina*, 551 F.2d at 561–62 n. 3.

■ Considering collectively the nature of the allegations in the case, the nature of the pretrial publicity, the explicit nature of the testimony of the witness who has been interviewed by Channel 6, the prejudicial and inflammatory nature of the "High Bail For Sex Cops" headlines on the Channel 6 news, (Def.'s Ex. 2), the fact that that reference was again intended to be used as the tagline on the story of the interview which is the subject of the first part of this Opinion, and the fact that the media reasonably can be expected to probe witnesses for similar statements now that one television station has done precisely that, the record here establishes that unrestrained discussions by the Government's witnesses with the media, be it print or electronic, presents a reasonable likelihood that there will be prejudicial news coverage before trial that would prevent a fair trial. The cumulative effect of the publication of numerous interviews with Government witnesses, unchecked by the rules of procedure, the rules of evidence, and cross-examination or rebuttal by the defendants, presents a high risk of prejudice to the defendants' right to a fair trial by an impartial jury. Accordingly, it is necessary to enter an Order restraining perspective witnesses from forecasting their probable testimony and opinions in interviews with the press or in a way which otherwise might lead to their dissemination.

Here too, the Court is required to consider the feasibility of alternatives such as change of venue and use of juror control methods. *In Re Lacie Russell*, 726 F.2d at 1009.

### A. Change of Venue

Conceptually a change of venue is always possible any time that there is a potentially available venue in another division of the district in which the offenses charged in the Indictment are alleged to have been committed. However, a change in venue deprives the defendants of the right to have a trial by jurors in the vicinage in which the crime occurred. Further, a change of venue in this instance would require moving the trial to

either the Alexandria Division or Norfolk Division of this Court. The result of such a change of venue would be substantial added expense, to be borne by two of the defendants who have retained their own counsel and to be borne by the public for the two defendants who have appointed counsel. It is unfair to unnecessarily increase the cost which he or she is to bear in order to secure the right of a fair trial by an impartial jury. Nor, in this case, are the interests of judicial efficiency and economy furthered by a change of venue. And, where, as is true here, the defendant has not requested a change of venue, the interest of justice is not served by a change of venue. Hence, the alternative of changing venue is an infeasible one, particularly compared to a limited restriction on the rights of free speech of Government witnesses.

## B. Postponement of the Trial

At the hearing on May 5, counsel for the United States advised that there is a possibility of additional charges in a Superseding Indictment and, of course, if that occurs, the defendants would be entitled to additional time in which to prepare to meet those charges. Thus, on this record, it appears that there is a possibility of a postponement of the trial. The question then becomes whether postponement of the trial can be expected to dissipate the prejudicial effect of repeatedly given witness statements. The answer to that is that it will not.

Once a witness has spoken to the press, the inquiry shifts to an issue of prior restraint of the press and, as discussed above, in our circuit, there must be clear and present danger to the fair trial before a prior restraint can be imposed on information in the hands of the press. *Central South Carolina Chapter, Society of Professional Journalists, Sigma Delta Chi v. United States District Court for the District of South Carolina,* 551 F.2d at 561–62 n. 3. When that is considered in perspective of the fact that a postponement would only allow additional time for the media to conduct interviews of

many Government witnesses, postponement actually increases the risk of a judicial pretrial publicity in this case.

## C. Voir Dire of Juror and the Instructions on the Duty to Consider Only Evidence Admitted in Court

In this case, these two factors go hand in hand and thus will be considered together. Where numerous Government witnesses have unrestrained access to make statements in the press, the situation is far different than that presented at this stage of the proceedings where only one witness has been interviewed by the press. The result of allowing free discussion of the testimony in the case in the press will be to expose potential jurors to a proliferation of cumulative testimony, all oriented to the Government's side of the case. And, because of Local Rule 57(C), counsel for the defendants will be unable to give balancing information or to discredit the statements given by witnesses who make comments adverse to their clients. Thus, as the trial approaches and publicity increases, there is an increasing volume of publicity, not about the allegations in the case but about the evidence in it, and in particular, its salacious aspects. Evidence of this particular ilk tends to be of the sort that is difficult to dislodge from the minds of jurors once heard and the greater the volume there is of it, the greater the task will be to assure the defendant's fair trial rights by voir dire or instructions. Given the volume of the Government's witnesses, it is rather clear that, if all, or even many, of them repeated their stories on the evening news, it would not be long before a one-sided presentation of the case would be in the minds of the potential jurors in this vicinage and, under that circumstance, it is simply not feasible to expect voir dire examination and limiting instructions to assure the fair trial rights of the defendants.[4]

## D. Sequestration of Jurors

The question of sequestration must be assessed in perspective of the expected length of the trial. As of now, the case is anticipat-

---

4. The decision in *Washington Post v. Hughes,* 923 F.2d 324 (4th Cir.1991) does not counsel otherwise for there the Court was concerned with one

allegation in a search warrant, a circumstance not comparable to that presented here.

ed to last four or five days and, if, as forecast by the United States Attorney's Office, additional charges are added, the trial may even last longer. This means that the jury would have to be sequestered for a considerable period of time. Sequestration, although available, "is a drastic remedy, which cannot be recommended lightly." *United States v. Simon,* 664 F.Supp. 780, 793 (S.D.N.Y.1987). As *Simon* correctly points out, sequestration is an undesirable alternative and lengthy sequestration creates circumstances in which "the resentments and ... harassment which derives from sequestration can often impede calm and rationale deliberation." *Id.* It is thus an infeasible alternative here.

On balance, there are no effective alternatives to mitigate the prejudicial effects that the witnesses' unfettered communications with the press (or otherwise for publication) likely will have on the defendants' rights to a fair trial. Also, there is no question about the probable efficacy of the restraint on the giving of extrajudicial statements by the witnesses to the press. It simply will foreclose putting the information in the hands of those who can widely disseminate it in the first instance.

A properly fashioned order requiring the proposed witnesses of both the United States and the defense to review the Order and to sign it with an understanding that violation of its consequences can lead to sanctions, will certainly make this an effective enforcement vehicle.

For the foregoing reasons, the Court finds that it is necessary to impose restraints upon the giving of extrajudicial statements to the press by witnesses in the case in order to adequately protect the rights of the defendants to a fair trial.

**5.** To the extent that defendant Brown opposes the motion for entry of an order restraining the Government witnesses from making statements to people other than the media, the relief granted herein does not affect the witnesses ability to speak with members of the public other than the media or those who the potential witness authorizes, intends, or expects to disseminate such statement by means of public communication, including, without limitation, the Internet.

## CONCLUSION

For the foregoing reasons, the defendant's Motion to Restrain Publication of the Witness Interview by Channel 6—Raycom—is denied and the defendant's Motion to Issue an Order Restraining Witnesses From Giving Interviews and Statements to the Press is granted, in part.[5]

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record by facsimile and regular mail.

It is so ORDERED.

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby ORDERED that the Defendant Marshall King's oral Motion to Restrain Publication of the Witness Interview by Raycom Media, Inc.[1] is DENIED and the Defendant Marshall King's Motion for Special Order Regarding Extrajudicial Statements[2] is GRANTED, in part. Accordingly, it is hereby ORDERED that:

(1) Any person who is a potential witness in this case, as defined in paragraph (2) below, SHALL NOT make any extrajudicial statement to any member of the print or electronic media, that relates to, concerns, or discusses (i) the testimony such potential witnesses may give at the trial of this case; (ii) any of the parties or issues such potential witness expects, or reasonably should expect, to be involved in this case; or (iii) the events leading up to, and culminating in, the alleged transactions in early 1998 in which cocaine base allegedly was exchanged for sexual favors from two women;

(2) A "potential witness" is a person who has been notified by the United States or by

**1.** At the May 5, 2000 hearing, defendants Bruno Crutchfield, Michael Wilkins and Nelson Brown joined the oral motion made by defendant King.

**2.** At the May 5, 2000 hearing, defendants Bruno Crutchfield and Michael Wilkins joined the written motion made by defendant King, however, the defendant Nelson Brown opposed entry of an Order restraining Government witnesses from making extrajudicial statements to other individuals.

the Defendants that he or she may be called to testify in this case;

(3) Any person who is a potential witness in this case shall not make any extrajudicial statement that relates to, concerns, or discusses (i) the testimony such potential witnesses may give at the trial of this case; (ii) any of the parties or issues such potential witness expects, or reasonably should expect, to be involved in this case; or (iii) the events leading up to, and culminating in, the alleged transactions in early 1998 in which cocaine base allegedly was exchanged for sexual favors from two women, if such potential witness intends such statement to be disseminated by means of public communication. This includes any proscribed statement by a potential witness to any third party whom such potential witness authorizes, intends, or expects to disseminate such statement by means of public communication, including, without limitation, the Internet;

(4) Nothing in this Order shall be deemed to prevent or interfere with the right of potential witnesses to discuss this case or any other case fully with counsel or any other individual that the witness does not authorize, intend or expect to disseminate such statement by means of public communication;

(5) Nothing in this Order shall be deemed to prevent or interfere with the right of any potential witness to testify in court or by way of court authorized depositions or interrogatories in connection with any other case about all events, issues and persons relevant to such case;

(6) Any potential witness, who has received notice of such Order and who violates the terms of this Order shall be subject to criminal prosecution for contempt of court following issuance of a show cause order and a hearing, with appropriate sanctions to be imposed upon conviction;

(7) To facilitate compliance with, and enforcement of, this Order, the United States shall file, under seal, a list of potential witnesses that it may call to testify at the jury trial in this action and shall update that list as it changes; and the United States shall deliver to each such listed witness a copy of this Order, with the direction that the witness shall acknowledge its receipt of the Order in writing and shall agree to abide by the terms of this Order. The United States shall file under seal all of the written acknowledgments. Nothing contained in this Order shall be deemed to limit the United States to the list of potential witnesses or to require that anyone so listed be called at trial;

(8) The Defendants also shall file, under seal, a list of potential witnesses that they may call to testify at the jury trial in this action and shall update that list as it changes; and the Defendants shall deliver to each such listed witness a copy of this Order, with the direction that the witness shall acknowledge its receipt of the Order in writing and shall agree to abide by the terms of this Order. The Defendants shall file under seal all of the written acknowledgments. Nothing contained in this Order shall be deemed to limit the Defendants to the list of potential witnesses or to require that anyone so listed be called at trial.

The Clerk is directed to send a copy of this Order to all counsel of record by facsimile and regular mail.

It is so ORDERED.