**UNITED STATES of America**

v.

**Marshall KING and Nelson Brown.**

**Crim. Nos. 3:00CR109–01, 3:00CR109–03.**

United States District Court,
E.D. Virginia,
Richmond Division.

July 11, 2000.

---

Michael C. Wallace, Assistant United States Attorney, Richmond, VA, for Government.

Matthew P. Geary, Richmond, VA, for King.

S. Neil Stout, Flax, Embrey & Stout, Richmond, VA, for Brown.

## MEMORANDUM OPINION

PAYNE, District Judge.

Raycom Communications, Inc. d/b/a WTVR News 6 ("WTVR") and its reporter, Jean Ziliani, as interveners in this case, have filed a motion to quash a subpoena duces tecum sought by the Defendants, Nelson Brown and Marshall King, under Fed. R.Crim.P. 17(c). The subpoena requests production of all unedited, unbroadcast videotapes, commonly known as "outtakes," of Ziliani's interview of Apryl Gauldin, a Government witness in this case, as well as any notes made by Ziliani during the interview. The subpoena also seeks production of any other statements made to WTVR or Ziliani by prospective witnesses to this case.[1] WTVR and Ziliani have moved to quash the subpoena on the ground that the materials sought are subject to a qualified reportorial privilege said to be found in the First Amendment to the United States Constitution.

## STATEMENT OF FACTS

On March 27, 2000, a federal grand jury returned an Indictment charging that Brown, King and their co-defendants participated in a conspiracy to distribute cocaine base; possessed cocaine base; distributed cocaine base to two women in exchange for sexual favors; and maintained a crack house.[2] The Indictment alleged that Apryl Gauldin was one of the women who received drugs in exchange for sexual favors and otherwise implicates her in some of the conduct alleged in the Indictment.

These, and other charges, were originally the subject of an indictment returned by a state grand jury. The somewhat salacious nature of the charges and the occupations of some of the defendants (a Virginia State trooper, a Police Chief of a local town, and a funeral parlor operator of some local notoriety) have attracted significant media attention to the case. As a result, numerous articles and television reports have been published since the initial state indictment in this case was returned. *See generally United States v. King*, 192 F.R.D. 527, 528–30 (E.D.Va.2000).

At the beginning of May 2000, Ziliani interviewed Gauldin at the state prison in which Gauldin is incarcerated on a charge unrelated to this case. In exchange for the interview, the reporter promised Gauldin that her name and identity would be kept in confidence and that, to that end, the interview would be published only by electronically masking Gauldin's face and altering her voice. The interview lasted approximately 40 minutes, and it was recorded on video tape.

On May 3, 2000, Ziliani sought comments from one of the defense counsel and, in so doing, advised that she had conducted an extensive interview with one of the witnesses in the case and was preparing a news program that would address the allegations in the case. Thereafter, the defense counsel and the Assistant United States Attorney, acting independently of Ziliani, identified Gauldin, who by then was known to be a

---

1. Specifically, the subpoena requests:
   Any and all recordings, of whatever nature, in unedited form, of any statements by or conversations with any person known or purporting to be a witness to alleged conduct in this case, and any notes, unedited or redacted of said statements or conversation with or between reporter Jean Zillioni [sic] and Apryl Gauldin.

2. The Indictment also charged various firearms offenses. The grand jury returned a Superseding Indictment on May 24, 2000, adding charges of

violations of the Mann Act, 18 U.S.C. § 2421, and the Travel Act, 18 U.S.C. § 1952(a)(3), and deleting some charges that were found in the original indictment. The Superseding Indictment does not identify by name any of the women who are alleged to have bought drugs for sex. Additionally, the Superseding Indictment alleges that up to five women were involved in the scheme, not just the two named in the original Indictment.

Government witness, as the person who had been interviewed by Ziliani.

All Defendants, except for Brown, then moved for entry of an order enjoining the Government's witnesses from making statements to the press or others, and to enjoin WTVR from publishing any part of the interview with Gauldin. After an evidentiary hearing on the motion, the Court viewed *in camera* the approximately four minutes of the interview that WTVR and Ziliani proposed to publish. By Memorandum Opinion and Order, dated May 8, 2000, the motion to restrain publication of the four minutes of the interview was denied; and the motion to enjoin Government witnesses from making extrajudicial statements was granted, in part. *King*, 192 F.R.D. at 532, 534–36.

On May 15 and 16, 2000, WTVR aired a two-part report that included brief segments of Gauldin's statements, electronically altered so as to disguise her voice and face. At oral argument on this motion, counsel for Brown represented that, when compared with the allegations of the Superseding Indictment and with discovery provided by the Government pursuant to an Agreed Discovery Order, the text of the aired segment of the Gauldin interview contains information exculpatory of Brown. King's counsel made a similar representation.

Counsel for WTVR and Ziliani agreed at oral argument that Gauldin gave the interview with the understanding that all, or any part, of it could be published. Hence, there is no issue of confidentiality as to the substance of the interview. And, it was agreed at oral argument that, considering the independent discovery of Gauldin's identity by counsel for the Defendants and the United States, the confidentiality of the source's identity is moot and hence is no longer a relevant factor in deciding the motion to quash. Finally, it is undisputed that the subpoena was not issued for purposes of harassment or vexation.

## DISCUSSION

### I. Have The Requirements Of Rule 17(c) Been Satisfied?

Before reaching the question whether WTVR and Ziliani hold a qualified privilege,

it is necessary to ascertain whether the subpoena duces tecum satisfies the requirements of Fed.R.Crim.P. 17, which generally governs the issuance of subpoenas in criminal cases. Subsection (c) of Rule 17 speaks directly to subpoenas duces tecum of documentary evidence that are returnable before trial:

> The court *may direct* that books, papers, documents or objects designated in the subpoena *be produced before the court at a time prior to the trial* or prior to the time when they are to be offered in evidence *and may* upon their production *permit* the books, papers, documents or objects or portions thereof to be *inspected by the parties* and their *attorneys.*

Fed.R.Crim.P. 17(c) (emphasis added). In *United States v. Nixon*, 418 U.S. 683, 699, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the Supreme Court of the United States set forth the standards by which district courts are to evaluate the enforceability of a subpoena duces tecum. Citing the established test devised by Judge Weinfeld in *United States v. Iozia*, 13 F.R.D. 335, 338 (S.D.N.Y.1952), the Supreme Court held that pretrial production of evidence by third parties pursuant to Rule 17(c) is appropriate only where the moving party shows:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*Id.* (footnote omitted); *see also Bowman Dairy Co. v. United States*, 341 U.S. 214, 221, 71 S.Ct. 675, 95 L.Ed. 879 (1951) ("In short, any document or other materials, admissible as evidence, obtained by the Government by solicitation or voluntarily from third persons is subject to subpoena."); *United States v. Beckford*, 964 F.Supp. 1010, 1031 (E.D.Va. 1997) (examining the requirements of Rule 17(c)).

The Supreme Court then conflated the generally accepted four facet formulation from *Iozia* into what has become the now talismanic paradigm: (1) relevancy; (2) admissibility; and (3) specificity. *Nixon*, 418 U.S. at 700, 94 S.Ct. 3090. In reality, the "admissibility" requirement of the *Nixon* formulation and the "evidentiary" requirement of *Iozia* (cited as the basis for *Nixon*) seem to be the same, while the "specificity" requirement of *Nixon* embodies both the "good faith" and "fishing expedition" concepts from *Iozia*, 13 F.R.D. at 338.

■ Ultimately, the decision whether to require the production of the requested documents before trial rests within the sound discretion of the district court. *See Nixon*, 418 U.S. at 702, 94 S.Ct. 3090.[3] Furthermore, as comprehensively discussed in *Beckford*, the movant for a subpoena duces tecum is required by Rule 17(c) to file a motion as the procedural means by which to secure issuance of a pretrial subpoena duces tecum. 964 F.Supp. at 1023–25. The motion, and the evidence adduced at the hearing of it, affords the basis on which that discretion is to be exercised. Against this background, the task is to determine whether the three requirements of relevancy, admissibility, and specificity have been fulfilled.

### A. Relevance

In *Nixon*, the Supreme Court concluded that, although the exact contents of the tape could not be fully described by the movant, "there was sufficient likelihood that each of the tapes contain[ed] conversations relevant to the offenses charged in the indictment." 418 U.S. at 700, 94 S.Ct. 3090. Here, the statements sought to be produced were made by one of the unindicted co-conspirators. After reviewing *in camera* the four minute segment proposed to be published, the Court confirmed that, although Gauldin's statements were more detailed and graphic than the allegations of the Indictment, Gauldin's statements clearly and directly concerned those allegations. *See King*, 192 F.R.D. 527, 530–31.

The unedited videotape of the entire Gauldin interview has been produced for *in camera* review.[4] A review of the whole interview leaves no doubt that the Defendants have satisfied the relevance requirement because, throughout the interview, Gauldin addresses in detail many of the allegations of the Superseding Indictment.

### B. Admissibility

■ Exculpatory evidence in the possession of third parties is subject to a subpoena duces tecum. *See United States v. Cuthbertson*, 651 F.2d 189, 195 (3d Cir.), *cert. denied*, 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594, (1981) ("*Cuthbertson II*"); *cf. Brady v. Maryland*, 373 U.S. 83, 87–88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d

---

3. Although district courts are admonished that their discretion in issuing Rule 17(c) subpoenas is circumscribed by the responsibility to prevent Rule 17(c) from being improperly used as a discovery alternative to Fed.R.Crim.P. 16, *see Bowman Dairy*, 341 U.S. at 220, 71 S.Ct. 675, where, as here, the subpoena is directed to a third party, that precise problem is not presented because Rule 16 regulates the discovery obligations of the United States and the defendant, and does not address how the United States or the defendant may secure evidence in the possession of third-parties. Nonetheless, *Nixon* instructs that, even as to third parties, Rule 17(c) does not confer a fishing license upon litigants in criminal cases.

4. In *United States v. Cuthbertson*, 630 F.2d 139, 144 (3rd Cir.1980), the Third Circuit assumed, without deciding, that the text of Rule 17(c) provides for *in camera* inspection of the materials ordered to be produced in subpoena duces tecum. The First Circuit found *in camera* review proper:

> [w]here there is a very likely need for materials by the defense, a very real if generalized concern about excessive disclosure on the part of the media, a judicial economy interest in avoiding delay during trial, and the possibility that by the time a decision must be made on disclosure to a party the need for disclosure will have disappeared or diminished.

*United States v. LaRouche Campaign*, 841 F.2d 1176, 1183 (1st Cir.1988); *accord In re Martin Marietta Corp.*, 856 F.2d 619, 621–22 (4th Cir. 1988) (affirming district court's conclusion after *in camera* review that subpoena met *Nixon* requirements).

104 (1972). It also is true that Rule 17(c) subpoenas usually are not to be used as a means of procuring purely impeachment material in advance of trial. *See Nixon*, 418 U.S. at 701, 94 S.Ct. 3090 ("Generally, the need for evidence to impeach witnesses is insufficient to require its production [under Rule 17(c) ] in advance of trial.") (citing *United States v. Carter*, 15 F.R.D. 367, 369–72 (D.D.C.1954) (Rule 17(c) may not be used to obtain statements of witnesses unless the witness testifies at trial)); *Cuthbertson II*, 651 F.2d at 195 (hearsay evidence which could only be used for impeachment may not be obtained by a Rule 17(c) subpoena); *Beckford*, 964 F.Supp. at 1032 (listing cases).

■ The rationale offered for generally eschewing the use of Rule 17(c) to secure impeachment material, whether in the hands of third parties or the Government, is that impeachment "materials 'ripen into evidentiary material only if and when the witness testifies at trial.'" *United States v. Messino*, 882 F.Supp. 115, 116 (N.D.Ill.1995) (quoting *United States v. Cuthbertson*, 630 F.2d 139, 144 (3rd Cir.1980), *cert. denied*, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981) ("*Cuthbertson I*")); *see also United States v. LaRouche Campaign*, 841 F.2d 1176, 1180 (1st Cir.1988) (for impeachment materials, "the admissibility prong of Rule 17(c) cannot be fully assessed until the corresponding witness testifies at trial."). Indeed, that reasoning animated the decision to reject the request for pretrial production of witness statements in *Carter*, 15 F.R.D. at 369, 371, the decision cited in *Nixon* as authority for the observation that "[g]enerally, the need

for evidence to impeach witnesses is insufficient to require its production in advance of trial." *Nixon*, 418 U.S. at 701–02, 94 S.Ct. 3090 (citing *Carter*, 15 F.R.D. at 371). It follows, therefore, that where it is known with certainty before trial that the witness will be called to testify, the admissibility determination, within the meaning of *Nixon*, can be made before trial, and the statements properly may be considered evidentiary. *See LaRouche Campaign*, 841 F.2d at 1180. In sum, witness statements useful for impeachment purposes are evidentiary within the meaning of *Nixon*, 418 U.S. at 699, 94 S.Ct. 3090, and within the meaning of *Iozia*, 13 F.R.D. at 338, 340–41, the decision which *Nixon* held to supply the test for Rule 17(c) subpoenas. The decisions which have analyzed the issue carefully[5] have recognized as much by disposing of the "admissibility/evidentiary" inquiry as a question of timing.

The admissibility facet of *Nixon* also must be assessed in perspective of the principle that a prior inconsistent statement, otherwise inadmissible as hearsay, "may be admissible for the limited purpose of impeaching the witness." *United States v. Ince*, 21 F.3d 576, 579 (4th Cir.1994). And, of course, if the witness, after being afforded an opportunity to explain or deny the statement, does not admit having made the prior inconsistent statement, the statement itself is admissible as an exhibit. Fed.R.Evid. 613(b); *see also United States v. Truslow*, 530 F.2d 257, 264 (4th Cir.1975); *United States v. Lutz*, 153 F.3d 723 (table), 1998 WL 486345 at *4 (4th Cir. Aug. 7, 1998).

Having viewed the videotape of the *Gauldin* interview *in camera* having considered

---

5. Several courts have analyzed the issue without considering the decisions in *Carter* and *Iozia* on which the general statement in *Nixon* was based. *See, e.g., United States v. Fields*, 663 F.2d 880 (9th Cir.1981); *United States v. Cherry*, 876 F.Supp. 547, 551 (S.D.N.Y.1995). Those decisions seem to articulate an absolute prohibition against use of Rule 17(c) to secure impeachment material before trial. That construction of Rule 17, which ignores the plain language of Rule 17(c), is at odds with the well-reasoned decisions which have made the issue a discretionary one depending upon the facts of particular cases and upon the certainty with which the court could say that the person giving the statement would testify at trial. That construction also is at odds

with the "chief innovation [of Rule 17(c) which] was to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials." *Nixon*, 418 U.S. at 698–99, 94 S.Ct. 3090. Furthermore, a broad brush prohibition against requiring pretrial production of impeachment materials runs counter to the fundamental notion reflected in the third facet of the test enunciated in *Iozia* which is that the material is essential for a proper preparation of trial. 13 F.R.D. at 338. In this case, there is no doubt, after viewing the interview and inspecting the charging documents, that this material is necessary to properly prepare a defense at trial.

defense counsel's assessment of the already published segment thereof, and having examined the Superseding Indictment, it is rather clear that Gauldin's statements in the interview will be useful for impeachment. And, here, there is no uncertainty whether Gauldin will testify. Indeed, at the hearing on this motion, counsel for the United States once again affirmed that Gauldin will testify at trial. The text of the original Indictment, the Superseding Indictment and the published segment of the Gauldin interview confirm this certainty. Thus, on this record, Gauldin's interview is evidentiary within the meaning of *Nixon* and *Iozia* and her statements will be admissible on cross-examination within the meaning of *Nixon, Carter, Iozia* and *Ince.* Hence, the Defendants have satisfied the "evidentiary/admissibility" facet of *Nixon.*

## C. Specificity

Contrary to WTVR and Ziliani's suggestion, the subpoena sought here is not fairly characterized as a general fishing expedition pursued by casting the "broadest possible net." (Motion to Quash at 3). The subpoena specifically requests the unedited recordings, and the interview notes, of the Gauldin interview, as well as any other recordings of statements by or conversations with other known or potential witnesses to this case. The request is therefore specific to any tapes or notes from conversations with witnesses in this case. However, the record here shows that the only witness who has given a statement is Gauldin. Thus, the subpoena will be modified to require production of only the Gauldin interview. That, and the record as a whole, forecloses any contention here that the subpoena is "a general fishing expedition." *Nixon,* 418 U.S. at 699, 94 S.Ct. 3090. And, there is no contention that the application for the subpoena was other than "in good faith." *Id.*

## D. Conclusion

An examination of the record shows that the subpoena duces tecum satisfies the three

Nixon factors and therefore is enforceable as a Rule 17(c) subpoena. Moreover, the interview is lengthy and, as in *Nixon,* "transcription of the [video] tapes may take a significant amount of time." *Nixon,* 418 U.S. at 702, 94 S.Ct. 3090. Clearly, the statement given to Ziliani by Gauldin is not available from any other source because the only alternate source is Gauldin, whose counsel has refused to let her be interviewed by counsel for Defendants. Considering the length of the interview and its substantive range, delaying production and inspection of the Gauldin interview videotape would simply delay the trial, and unreasonably so.

## II. Whether WTVR And Ziliani Hold A Qualified Newsreporter's Privilege Pursuant To The First Amendment?

WTVR and Ziliani argue, however, that they cannot be compelled to provide the videotape of Ziliani's interview with Gauldin because, in their view, a newsreporter has a qualified First Amendment privilege against disclosure of information obtained during the process of newsgathering. Thus, they assert what is often referred to as the "reportorial privilege" which was born in *Garland v. Torre,* 259 F.2d 545 (2nd Cir.), *cert. denied,* 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958).[6]

The Supreme Court of the United States first confronted the issue in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). Therefore, analysis of the reportorial privilege claimed by WTVR and Ziliani must begin with an understanding of *Branzburg.*

### A. *Branzburg v. Hayes* Examined

■ *Branzburg* actually was four separate cases each of which involved a journalist who had been held in contempt for failure either to appear, or to testify, before grand juries which were investigating criminal conduct as to which the reporters had secured informa-

---

**6.** *See* Sharon K. Malheiro, Note, *The Journalist's Reportorial Privilege—What Does It Protect And*    *What Are Its Limits,* 38 Drake L.Rev. 79 (1988).

tion in the process of preparing stories for publication in newspapers. In one case, Branzburg appeared before the grand jury but declined to identify individuals whom he had seen in possession of marijuana or persons whom he had observed making hashish from marijuana while he was preparing an investigative report about marijuana production in Jefferson County, Kentucky. *Branzburg,* 408 U.S. at 667–68, 92 S.Ct. 2646. The State trial judge ordered Branzburg to answer the questions and that order was affirmed on appeal by the State supreme court. In another case, Branzburg was subpoenaed to testify about criminal activity, which he had observed and photographed in Frankfort, Kentucky while investigating drug use in that city. Branzburg's motion to quash the subpoena which required him to testify about violations of Kentucky's drug laws was denied by the State trial and appellate courts. *Id.* at 669–70.

The third case decided in *Branzburg* was *In re Pappas* in which a television newsman/photographer refused to answer questions about events that had taken place in Black Panther headquarters to which the reporter was granted entry so that he could record photographically, and report on, an anticipated police raid on the organization's headquarters. The State trial and appellate courts denied Pappas' motion to quash.

The fourth case in *Branzburg* was *United States v. Caldwell,* in which Caldwell, a reporter also assigned to cover the Black Panther party and other black militant groups, was subpoenaed to appear before the grand jury and to testify about interviews given him for publication by officers and spokesmen of the Black Panther party and to produce the notes and tape recordings of those interviews. Caldwell refused to appear before the grand jury, he was cited for contempt, and the citation was affirmed on appeal.

Against those factual backgrounds, the Supreme Court considered the claims of the three newsmen (Branzburg, Pappas and Caldwell) that they possessed a privilege not to identify the sources, or the substance, of information that they had confidentially obtained in the preparation of news reports because "the burden on news gathering resulting from compelling reporters to disclose confidential information outweighs any public interest in obtaining the information." *Branzburg,* 408 U.S. at 681, 92 S.Ct. 2646. Justice White wrote the opinion for the Court, which was joined by Chief Justice Burger, Justice Blackmun, Justice Powell and Justice Rehnquist. In addition to joining the opinion of the Court, Justice Powell wrote a simple concurrence.[7] Justice Stewart wrote a dissent, which was joined by Justices Brennan and Marshall. Justice Douglas filed a dissent in *United States v. Caldwell,* 408 U.S. 665, 711, 92 S.Ct. 2686, 33 L.Ed.2d 657 (1972), which explicitly applied to the judgments in *Branzburg* and *Pappas.*

The *Branzburg* majority began its decision by acknowledging the undeniable importance of the First Amendment and the rights of the press. At the same time, the Court also outlined a goodly number of restrictions on the rights of the press established in its previous First Amendment jurisprudence.

7. 408 U.S. at 709–10, 92 S.Ct. 2646; *see also* Igor Kirman, Note, *Standing Apart To Be A Part: The Precedential Value Of Supreme Court Concurring Opinions,* 95 Columbia L.Rev.2083, 2094 (1995). A simple concurrence is announced "Justice X, concurring." *Id.* at 2084 n. 9. In *Branzburg,* Justice Powell announced his separate opinion as "Justice Powell, concurring." 408 U.S. at 709, 92 S.Ct. 2646. A simple concurrence is a statement by a Justice who "explicitly agree[s] with both the legal rule and the outcome announced by the lead opinion and simply expand[s] upon that analysis in a separate opinion." Ken Kimura, Note, *A Legitimacy Model for the Interpretation of Plurality Decisions,* 77 Cornell L.Rev. 1593, 1595 n. 13 (1992). Because of this, "[a] decision with only a simple concurrence should not be considered a plurality decision." *Id.* Therefore, contrary to some commentators' remarks, *see e.g.* Michael Fitzsimmons, *Defending the Informers: The Media's Right to Protect Non–Confidential Source Information Following United States v. Smith,* 6 Vill. Sports & Ent.L.J. 295 (1999); Paul Marcus, *The Reporter's Privilege: An Analysis of the Common Law, Branzburg v. Hayes, and Recent Statutory Developments,* 25 Ariz.L.Rev. 815 (1984), the opinion authored by Justice White is a majority, and not a plurality, opinion.

*Branzburg*, 408 U.S. at 683–85, 92 S.Ct. 2646. In perspective of those restrictions, the Court observed that:

> It is thus not surprising that the great weight of authority is that newsmen are not exempt from the normal duty of appearing before a grand jury and answering questions relevant to a criminal investigation. At common law, courts consistently refused to recognize the existence of any privilege authorizing a newsman to refuse to reveal confidential information to a grand jury. In 1958, a news gatherer asserted for the first time that the First Amendment exempted confidential information from public disclosure pursuant to a subpoena issued in a civil suit, [citing *Garland v. Torre*], but the claim was denied, and this argument has been almost uniformly rejected since then although there are occasional dicta that, in circumstances not presented here, a newsmen might be excused.

*Branzburg*, 408 U.S. at 685–86, 92 S.Ct. 2646 (citations omitted).

Having concluded that the claimed reportorial privilege had been rather thoroughly rejected by the state and federal courts, *Branzburg*, 408 U.S. at 685–86, 92 S.Ct. 2646, and that the common law provided no support for it, *id.* at 685, 92 S.Ct. 2646, the Court observed that seventeen states had provided reporters with a statutory privilege of varying dimensions, "but the majority have not done so, and none has been provided by federal statute." *Branzburg*, 408 U.S. at 689, 92 S.Ct. 2646. Against that background, the Court framed the issue by explaining that:

> Until now the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination. *We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy.*

*Branzburg*, 408 U.S. at 689–90, 92 S.Ct. 2646 (emphasis added). And, the Court rendered its decision in the next sentence by concluding: *"This we decline to do." Id.* (emphasis added).

The explanation offered for this explicit and unequivocal rejection of a reportorial privilege was that:

> Fair and effective law enforcement aimed at providing security for the person and property of the individual is a fundamental function of government, and the grand jury plays an important constitutionally mandated role in this process. On the records now before us, *we perceive no basis for holding that the public interest in law enforcement* and in ensuring effective grand jury proceedings *is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a* valid grand jury investigation *or criminal trial.*

408 U.S. at 690–91, 92 S.Ct. 2646 (emphasis added).

In reaching that conclusion, the Court flatly rejected the principal arguments made by the reporters that, absent protection of confidential sources by virtue of a privilege for the reporter, there would be a substantial burden on the newsgathering function and the consequent reporting function. That rejection, which was explained in great detail, *Branzburg*, 408 U.S. at 691–701, 92 S.Ct. 2646, was loudly decried as without merit by Justice Stewart's dissent, *id.* at 735–36, 92 S.Ct. 2646, but was not at all diminished by Justice Powell's concurring opinion. The Court also grounded its decision to deny a reportorial privilege on the extreme difficulty of applying it. *Branzburg*, 408 U.S. at 703–06, 92 S.Ct. 2646.

*Branzburg* thus clearly and quite unequivocally rejected the existence of a reportorial privilege grounded in the First Amendment. Having done so, it reversed the decision in *Caldwell*, thereby requiring the reporter to testify before the grand jury, affirmed the newsman's citation for contempt in *Branzburg*, and required the newsman in *Pappas*

to appear before the grand jury and answer questions put to him.

Although he joined the opinion for the Court prepared by Justice White, Justice Powell also issued a concurring opinion "to emphasize what seems to me to be the limited nature of the Court's holding." *Branzburg*, 408 U.S. at 709, 92 S.Ct. 2646 (Powell, J., concurring). In that simple concurrence, Justice Powell observed that "... if the newsman is called upon to give information bearing *only a remote and tenuous relationship* to the subject of the investigation, or if he has some other reason to believe that his *testimony implicates confidential source relationship without a legitimate need of law enforcement, he will have access to the court on a motion to quash* and an appropriate protective order may be entered." *Id.* at 710, 92 S.Ct. 2646 (emphasis added). Justice Powell used the term "privilege" in the next sentence but it seems clear in context that the reference actually was directed to the judicial protections and remedies available to a reporter when called upon: (i) to give information that was remote and tenuous to the subject of the investigation; or (ii) to disclose confidential source information "without a legitimate need of law enforcement." *Id.* In those two instances, Justice Powell explained that "the courts will be available to newsmen under circumstances where legitimate First Amendment interests require protection." *Id.* And, as to that point, Justice Powell's concurring opinion explicated an observation that was made by Justice White at the conclusion of the opinion for the Court. There, Justice White explained that:

> [N]ews gathering is not without its First Amendment *protections,* and grand jury *investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment.* Official *harassment* of the press undertaken *not for the purposes of law enforcement* but *to disrupt* a reporter's relationship with his news sources

would have no justification. Grand juries are *subject to judicial control and subpoenas to motions to quash.* We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth.

*Id.* at 707–08, 92 S.Ct. 2646 (emphasis added) (footnote omitted).

Significantly, Justice Powell's concurring opinion did not disassociate his views from the main, and quite unequivocal, holding of the majority opinion (which Justice Powell joined) that there was no reportorial privilege under the First Amendment. And, when viewed in context of Justice White's majority opinion, the concurring opinion simply underscores that, in so holding, the Court was not depriving reporters of the protections which they already enjoyed under the First Amendment, a proposition also advanced by Justice White. And, to Justice Powell, the need for protection was to be judged on a case-by-case basis, with an appropriate balance to be struck based on the specific facts of each case.

To argue, as do some, that Justice Powell's concurring opinion creates, *sub silento,* the very privilege that was so clearly rejected in the majority opinion which he joined is to read far too much into the use of the word "privilege" in one sentence and to ignore the thrust of the concurring opinion which was *to* underscore protection for the reporter in two clearly articulated instances. Nonetheless, that appears to be what some lower courts have done.

## B. *Branzburg,* As Applied By Some Courts Of Appeals

An understanding of the developments in the lower courts following *Branzburg* requires some brief explication of the dissent filed by Justice Stewart and joined by Justice Brennan and Justice Marshall.[8] The dissent acknowledged that "whether a reporter has a constitutional right to a confidential relation-

---

8. Justice Douglas' dissent reflects his continued absolutist view of the First Amendment and is not in harmony with the dissent filed by Justices Stewart, Brennan and Marshall.

ship with his source is of first impression here." *Branzburg,* 408 U.S. at 725, 92 S.Ct. 2646 (Stewart, J., dissenting).

The dissent took the view that:

[w]hen a reporter is asked to appear before a grand jury and reveal confidences, I would hold that the government must (1) show that there is probable cause to believe that the newsman has information that is clearly relevant to a specific probable violation of law; (2) demonstrate that the information sought cannot be obtained by alternative means less destructive of First Amendment rights; and (3) demonstrate a compelling and overriding interest in the information.

*Id.* at 743, 92 S.Ct. 2646 (footnotes omitted). The majority opinion clearly rejected that rationale, *Branzburg,* 408 U.S. at 690, 700–01, 92 S.Ct. 2646, and, fairly read, Justice Powell's concurring opinion does not remotely subscribe to the approach taken by Justice Stewart's dissent.

Notwithstanding the Supreme Court's rejection in *Branzburg* of the reportorial privilege in words both plain and clear, a number of courts of appeals have held that, under certain circumstances and for varying reasons, Justice Powell's concurring opinion creates a qualified reportorial privilege. Some circuits have confined that privilege to civil cases and others have held that it applies to both civil and criminal cases.

In one of the first post-*Branzburg* decisions, *Farr v. Pitchess,* 522 F.2d 464, 467–68 (9th Cir.1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1203 (1976), the Ninth Circuit interpreted *Branzburg* as establishing a qualified privilege for journalists in all judicial proceedings, civil and criminal alike. However, more recently, the Ninth Circuit has refused to recognize a reporter's privilege in response to a grand jury subpoena. *In re Grand Jury Proceedings,* 5 F.3d 397 (9th Cir.1993), *cert. denied sub nom., Scarce v. United States,* 510 U.S. 1041, 114 S.Ct. 685, 126 L.Ed.2d 652 (1994) (but suggesting that this rule might be confined to grand jury context).

Some circuits, relying on Justice Powell's concurrence, have explicitly recognized a qualified reportorial privilege in criminal cases. *See e.g. United States v. LaRouche Campaign,* 841 F.2d 1176, 1182 (1st Cir. 1988); *United States v. Burke,* 700 F.2d 70, 77 (2d Cir.), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *Cuthbertson I,* 630 F.2d 139, 147 (3d Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); *cf. United States ·v. Caporale,* 806 F.2d 1487, 1504 (11th Cir.1986) (without discussion adopting standard for reportorial privilege as articulated in *Miller v. Transamerican Press, Inc.,* 621 F.2d 721, *modified,* 628 F.2d 932 (5th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981)), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981).

The Fifth Circuit, in *Miller,* 621 F.2d at 725, a libel action, held that a reporter had a First Amendment privilege to refuse to disclose the identity of a confidential informant. However, subsequently, the Fifth Circuit has held that reporters do *not* enjoy a qualified privilege not to disclose non-confidential information in criminal cases. *United States v. Smith,* 135 F.3d 963, 972 (5th Cir.1998) (explicitly reserving ruling on confidential information in criminal cases).

The United States Court of Appeals for the District of Columbia Circuit appears only to have considered the reportorial privilege in the civil context, recognizing a qualified privilege in *Zerilli v. Smith,* 656 F.2d 705, 714 (D.C.Cir.1981). The District Court for the District of Columbia, however, has recognized the reportorial privilege in a criminal case. *United States v. Hubbard,* 493 F.Supp. 202, 205 (D.D.C.1979).

Although the United States Court of Appeals for the Tenth Circuit has recognized a reportorial privilege in civil actions, *see Silkwood v. Kerr–McGee Corp.,* 563 F.2d 433, 436–37 (10th Cir.1977), it has not examined whether such a privilege also exists in the criminal context. The Seventh Circuit has not addressed the issue. And, the Eighth Circuit, in a footnote following a citation to

*Branzburg* with the parenthetical observation: "rejecting news reporter's privilege," stated:

Some courts have interpreted *Branzburg* as establishing a qualified news reporter's privilege. Although the Ninth Circuit in *Shoen* cited our opinion in *Cervantes [v. Time, Inc.,* 464 F.2d 986 (8th Cir.1972)] for support, we believe this question is an open one in this Circuit.

*In re Grand Jury Subpoena Duces Tecum,* 112 F.3d 910, 918 n. 8 (8th Cir.) (citations omitted), *cert. denied sub nom., Office of President v. Office of Independent Counsel,* 521 U.S. 1105, 117 S.Ct. 2482, 138 L.Ed.2d 991 (1997).

Thus, it is fair to say that many courts of appeals have been less than faithful in adhering to the explicit decision in *Branzburg,* most often offering as the justification, Justice Powell's concurring opinion which, as outlined above and, as explained by the Sixth Circuit, affords no real warrant for the rather widespread disregard of *Branzburg* by the courts of appeals which have used the concurrence to conclude that *Branzburg* created a reportorial privilege.[9] The Sixth Circuit articulated quite clearly why the general defalcation by some courts of appeals from the majority opinion in Branzburg (on the theory that it is warranted by the concurring opinion of Justice Powell) is simply unwarranted. *Storer Communications, Inc. v. Giovan,* 810 F.2d 580 (6th Cir.1987).

In *Storer Communications,* Bradley M. Stone, a Storer reporter, was held in contempt and subsequently imprisoned for failure to comply with a subpoena to give evidence before a grand jury. In particular, Stone was issued a subpoena duces tecum to produce certain videotapes reporting on the activities of Detroit youth gangs. The videotapes were sought to identify gang members in connection with an investigation of the murder of a state police officer. It was alleged that two of the gang members present during a filming of Stone's production had committed the murder. The videotape was thought to permit identification of the perpetrators.

The Sixth Circuit began its analysis by making the observation that "[i]n contending that, as a newsreporter, he [Stone] was entitled to assert a 'privilege grounded in the First Amendment,' Stone would have us restructure the holding of the Supreme Court in *Branzburg v. Hayes* since the majority opinion in that case rejected the existence of such a first amendment testimonial privilege." *Storer Communications,* 810 F.2d at 583 (citation omitted). In support of that observation, the Sixth Circuit cited the text of *Branzburg,* 408 U.S. at 689–91, 92 S.Ct. 2646, in which the claim of privilege was clearly rejected ("[t]his we decline to do"), and then explained the predicate for the reporter's argument:

Stone insists, however, that when his reading of Justice Powell's concurring opinion is superimposed upon Justice White's majority decision, the government is required to make "a clear and convincing showing of relevancy, essentiality, and exhaustion of non-media sources" for obtaining the information before he can be compelled to testify. In arguing that this amounts to a "qualified privilege," Stone relies heavily upon the dissenting opinion of three justices in Branzburg, and upon opinions from other circuit courts.

*Storer Communications,* 810 F.2d at 583–84. The Sixth Circuit rejected the reporter's argument, concluding that, because acceptance of Stone's position "would be tantamount to our substituting, as the holding of Branzburg, the dissent written by Justice Stewart

---

9. Indeed, the commentators correctly have observed that there is afoot a general revolution in the courts of appeals when it comes to adhering to the five Justice majority in *Branzburg. See generally* Christopher J. Clark, *The Recognition of a Qualified Privilege for Non–Confidential Journalistic Materials: Good Intentions, Bad Law,* 65 Brook.L.Rev. 369 (1999); Alison Lynn Tuley, Note, *Outtakes, Hidden Cameras, and the First Amendment: A Reporter's Privilege,* 38 Wm. & Mary L.Rev. 1817 (1997); Brian M. Cullen, Note, *Circumventing Branzburg: Absolute Protection for Confidential News Sources,* 18 Suffolk U.L.Rev. 615 (1984).

(joined by Justices Brennan and Marshall) for the majority opinion, we must reject that position." *Id.* at 584. That conclusion was followed immediately by the Sixth Circuit's observation that five of the Justices (Justices White, Blackmun, Powell, and Rehnquist and Chief Justice Berger) had explicitly declined to recognize the existence of a First Amendment reporter's testimonial privilege not enjoyed by other citizens. *Id.*

Then, after explaining the rationale of the dissent by Justice Stewart, the Sixth Circuit stated that:

> Accordingly, we decline to join some other circuits, to the extent that they have stated their contrary belief ... and have thereupon adopted the qualified privilege balancing process urged by the three Branzburg dissenters and rejected by the majority.

*Id.* at 584–85 (footnote omitted). The Sixth Circuit went on to articulate what it perceived to be the error of those courts which had accepted Justice Powell's concurring opinion as supplying a rule different than the majority opinion. To that end, the court cited the part of Justice Powell's opinion relied on by those errant decisions:

> The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions. In short, the courts will be available to newsmen under circumstances where legitimate First Amendment interests require protection.

*Id.* at 585 (quoting *Branzburg,* 408 U.S. at 710, 92 S.Ct. 2646 (Powell, J., concurring)). As to that text, the Sixth Circuit held:

> That portion of Justice Powell's opinion certainly does not warrant the rewriting of the majority opinion to grant a First Amendment testimonial privilege to news-

reporters, especially when the quoted language is considered in the context of that language which precedes it.

*Id.*

The justification for that interpretation of Justice Powell's concurrence was that "Justice Powell was alluding to" the language from the majority opinion at the end of Justice White's opinion which explained that reporters had certain protections. *Id.* (citing *Branzburg,* 408 U.S. at 707–08, 92 S.Ct. 2646). *Storer* then concluded that "[i]t is readily apparent, then, that Justice Powell's concurring opinion is entirely consistent with the majority opinion, and neither limits nor expands upon its holding, but that, instead, it responds to what Justice Powell perceived as an unwarranted characterization of that holding by Justice Stewart." *Id.*

An examination of the decisions that rely on Justice Powell's concurring opinion to find a qualified reportorial privilege shows the truth of the Sixth Circuit's view that:

> Perhaps Justice Powell's use of the term "privilege" has provided too great a temptation for those inclined to disagree with the majority opinion. In the sense that the balancing referred to by Justice Powell, when instigated by a reporter seeking to protect a confidential source, may result in the denial to a party of the use of evidence which is reliable, one is reminded of the invocation of a "privilege" as contrasted with an "exclusion" which prohibits the introduction of evidence which is unreliable or calculated to mislead or prejudice. But, this balancing of interest should not then be elevated on the basis of semantical confusion, to the status of a first amendment constitutional privilege.

*Id.* at 585–86 (footnote omitted).

Rather, as instructed by the majority and concurring *Branzburg* opinions, and as explained by the Sixth Circuit, district courts must make, on a case-by-case basis, a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony "by determining whether the re-

porter is being harassed in order to disrupt his relationship with confidential news sources, whether the grand jury's investigation is being conducted in good faith, whether the information sought bears more than a remote and tenuous relationship to the subject of the investigation, and whether a legitimate law enforcement need will be served by forced disclosure of the confidential relationship." *Id.* at 586, 92 S.Ct. 2646.

### C. *Branzburg,* As Applied By The Fourth Circuit

The decisions of the United States Court of Appeals for the Fourth Circuit also teach that approach. However, some of those decisions do so by describing the balancing as if it were a qualified privilege. Hence, it is necessary to assess those decisions, some of which the parties have cited and some of which they have not.

The Fourth Circuit first applied *Branzburg* in *United States v. Steelhammer,* 539 F.2d 373 (4th Cir.1976), wherein the court reviewed the order of a district court committing newsreporters to six months imprisonment for contempt of an order directing them to answer questions of the prosecuting counsel when they were called to be witnesses under subpoena in a civil contempt trial. The majority opinion in *Steelhammer* construed *Branzburg* to require "a balancing of two vital considerations: protection of the public by exacting the truth versus protection of the public through maintenance of free press." *Steelhammer,* 539 F.2d at 375. The majority construed *Branzburg,* not to accord "a privilege, absolute or qualified, to the reporter," but to provide a privilege to the public. *Id.*

Judge Winter dissented from that view; and his opinion subsequently was adopted as the opinion of the Fourth Circuit, sitting *en banc,* in *United States v. Steelhammer,* 561 F.2d 539 (4th Cir.1977). Judge Winter observed that the reporters had not acquired "the information sought to be elicited from them on a confidential basis" and that a "study of the record fails to turn up even a

scintilla of evidence that the reporters were subpoenaed to harass them or to embarrass their newsgathering abilities at any future public meetings that the miners might hold." 539 F.2d at 376. Thereupon, Judge Winter explained that:

> It therefore seems to me that, in the balancing of interests suggested by Mr. Justice Powell in his concurring opinion in *Branzburg v. Hayes,* the absence of a claim of confidentiality *and* the lack of evidence of vindictiveness tip the scale to the conclusion that the district court was correct in requiring the reporters to testify.

*Id.* (emphasis added) (citation omitted).

Because Judge Winter's opinion subsequently became the decision of the *en banc* court, his observations about the majority opinion are particularly important. On that point, Judge Winter explained that the absence of confidentiality *and* the absence of evidence of vindictiveness "convert the majority's conclusion into a broad holding that journalists called as witnesses in civil cases have a privilege to refuse to testify about all events they have observed in their professional capacity if other witnesses to the same events are available, despite the avowal that the holding is limited to the facts of the case." *Id.* Quite clearly then, by adopting Judge Winter's dissent as the opinion of the Court *en banc,* the Fourth Circuit, in *Steelhammer,* rejected the reportorial privilege and grounded its decision in the language of Justice Powell's concurrence, which like the concluding paragraphs of the *Branzburg* majority opinion, assures that reporters will be protected from harassment even though they have no First Amendment privilege, qualified or absolute.

The next occasion for consideration of the reportorial privilege by the Fourth Circuit was in *LaRouche v. National Broadcasting Co., Inc.,* 780 F.2d 1134 (4th Cir.1986), *cert. denied,* 479 U.S. 818, 107 S.Ct. 79, 93 L.Ed.2d 34 (1986). *LaRouche* involved a civil action for defamation and a counterclaim for interference with business relations in which the plaintiff, LaRouche, moved to com-

pel NBC to disclose the confidential sources of a story which was asserted to be defamatory. The district court refused to compel NBC to disclose confidential sources. In *LaRouche,* the Court of Appeals articulated this protection as "the journalist's privilege." Specifically the Court held that "[i]n determining whether the journalist's privilege will protect the source in a given situation, it is necessary for the district court to balance the interests involved." 780 F.2d at 1139 (citing Justice Powell's concurring opinion in *Branzburg.*) The court then turned to a test adopted by the Fifth Circuit observing that:

> To aid in the balancing of these interests, courts have developed a three part test: (1) whether the information is relevant, (2) whether the information can be obtained by alternative means, and (3) whether there is a compelling interest in the information.

*Id.* (citing *Miller v. Transamerican Press, Inc.,* 621 F.2d 721).

Six years later, the Fourth Circuit once again had occasion to assess the meaning of *Branzburg* in *In re Shain,* 978 F.2d 850 (4th Cir.1992). In *Shain,* the Court of Appeals reviewed, and affirmed, the contempt convictions of four reporters who refused to testify in a criminal trial about matters learned by the reporters during their newsgathering activities. The affirmance of the conviction used both the language of privilege and of protection:

> [W]e hold that the incidental burden on the freedom of the press in the circumstances of this case does not require the invalidation of the subpoenas issued to the reporters and *absent evidence of governmental harassment or bad faith, the reporters have no privilege different from that of any other citizen not to testify about knowledge relevant to a criminal prosecution.*

*Shain,* 978 F.2d at 852 (emphasis added).

However, when explaining that its decision in *Shain* was directed by the decisions in *Branzburg* and *Steelhammer,* the Fourth

Circuit explicitly recognized that "[i]n *Branzburg* the Supreme Court refused to recognize a reporter's privilege not to testify in criminal prosecutions about relevant evidence known to the reporter, regardless of whether the information was obtained during newsgathering." *Id.* Following that observation, the Court of Appeals quoted the language from the *Branzburg* majority opinion in which the Court explicitly declined to create a privilege. *Id.* At the same time, the Fourth Circuit recognized that, in *Branzburg,* the Supreme Court had reaffirmed "First Amendment protections of news gathering" even though it had refused to create a reportorial privilege. *Id.* In that regard, the court articulated that the "Supreme Court cautioned that if information is sought from the press other than in good faith, a different issue is presented: 'Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification.'" *Id.* (quoting *Branzburg,* 408 U.S. at 707, 92 S.Ct. at 2670 (the majority opinion)).

The court then turned its attention to the concurring opinion of Justice Powell and held that "[i]n *Steelhammer,* we applied *Branzburg* to compel testimony from the press in a civil contempt trial, recognizing that *only when evidence of harassment is presented do we balance the interests involved.*" *Id.* at 853 (citing Judge Winter's dissent in *Steelhammer* ). Thereupon, the Fourth Circuit, after assessing the record, found that the reporters had asserted neither that the statements were given in confidence nor that there was harassment, observed that the reporter's testimony would be relevant and not duplicative, and concluded that "the absence of confidentiality or vindictiveness in the facts of this case fatally undermines the reporter's claim to a First Amendment privilege." *Id.* at 853. In so doing, the opinion in *Shain* again resorted to the word "privilege," but the holding in *Shain* rests squarely upon the observation that *Branzburg* had explicitly rejected the invitation to create a privilege and had been grounded, both in the majority

and in Justice Powell's concurring opinion, in the need to protect the press from harassment.

In fact, it was precisely that construction of *Branzburg* by the *Shain* majority that prompted Judge Wilkinson to issue a separate opinion concurring in the judgment reached by the majority, but declining to "embrace its reasoning." *Shain*, 978 F.2d at 854. Judge Wilkinson would require the balancing specified in *LaRouche* in circumstances other than when the record demonstrated the presence of harassment. As Judge Wilkinson put it:

> The majority implies, however, that the interest of the newsgatherer amounts to no more than an interest in remaining free from state harassment. Because a subpoena can rarely be challenged successfully on that basis, I submit that the reportorial interest, as defined by the majority, is not much of an interest at all.

*Id.* at 854 (Wilkinson, J., concurring). Although Judge Wilkinson's concurring opinion also mentions the word "privilege," its thrust is not to create a privilege, but to require the kind of balancing called for by Justice Powell in circumstances other than when harassment is demonstrated by the record.

Therefore, the predicate for conducting the balancing of factors identified in *LaRouche* is, as a consequence of the decision in *Shain*, the circumstance in which both confidentiality of the source material and vexation or harassment is demonstrated by the record.

In sum, a survey of the decisions in this circuit teaches that our Court of Appeals has recognized that *Branzburg* does not create a reportorial privilege, but that it entitles reporters to protection under certain circumstances.[10]

■ Here, the source was promised that her identity would be kept in confidence and the reporter has adhered to that promise. However, the source gave the information on the record and with the knowledge that the reporter intended to air all or part of it to the public. Hence, there is no claim here that the substance of the source's communications were to be maintained in confidence (as might be the case, for example, if the source gave the information off the record and with the understanding that it was not for publication or quotation).

Thus, the only confidentiality involved here is the identity of the source. That, however, is a moot point because counsel for the Defendants independently arrived at the identity of the source and that identity is now a matter of public record. Hence, to the extent that there was confidentiality attached to the identification of the source, it has been eliminated. And, there is certainly nothing in this record to suggest that this prosecution or the desire to secure this evidence is animated by harassment or vexatiousness.

For the foregoing reasons, *Branzburg* affords no First Amendment reportorial privilege to WTVR or Ziliani.[11] And, under *Shain*, the balancing process called for by

---

10. WTVR and Ziliani rely, in part, on the Fourth Circuit's decision in *Church of Scientology International v. Daniels*, 992 F.2d 1329 (4th Cir.), *cert. denied*, 510 U.S. 869, 114 S.Ct. 195, 126 L.Ed.2d 153 (1993), which involved a civil defamation action. In a very brief discussion, and without any citation to *Branzburg*, the Court held that the movant had failed to make the showing required for production of privileged materials, citing to *LaRouche*. 992 F.2d at 1335. In a parenthetical next to the citation to *LaRouche*, the Court succinctly set forth the balancing test adopted in *LaRouche*. *Id.* WTVR and Ziliani cite *Daniels* for the proposition that non-confidential materials are also protected by the asserted reportorial privilege. However, the Court, in *Daniels*, did not conclude that at all. Rather, the Court reasoned that non-confidentiality only influenced as-

sessment of the relevance factor under *LaRouche*. *Id.; see also LaRouche*, 780 F.2d at 1139 (the fact that movant already knew confidential sources' identities influenced court's finding that movant had not exhausted alternative means of obtaining information). In any event, the construction of *Daniels* urged by WTVR and Ziliani is directly contrary to the conclusion in *Steelhammer*, 539 F.2d at 376 (Winter, J., dissenting), adopted by, 561 F.2d 539, 540 (4th Cir.1977) (en banc), that absence of confidentiality is a factor that goes in favor of disclosure. Accordingly, *Daniels* does not provide any meaningful support for WTVR and Ziliani's motion.

11. There is no contention here that the reportorial privilege is available under Federal Rule of Evidence 501. *See*, Boutrous & Stodder, *Retool-*

*LaRouche* is not called into play here because there is neither vexation, harassment nor any remaining confidentiality. Accordingly, under the controlling precepts in this circuit, the motion to quash the subpoena for the videotape of the Gauldin interview must be denied.

■ Even if, as WTVR and Ziliani argue, the test to be applied is the balancing process set forth in *LaRouche*, the motion to quash the subpoena still must be denied. Under *LaRouche*, the factors to be assessed are: (1) whether the information sought is relevant; (2) whether the information could have been obtained by alternative means; and (3) whether there is a compelling interest in the information. 780 F.2d at 1139.

For the reasons explained in Part I above, the information sought by the subpoena is relevant and it cannot be obtained by alternative means. There is a compelling interest in having "every man's evidence" at a criminal trial, *Branzburg*, 408 U.S. at 688, 92 S.Ct. 2646 (quoting *United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950)), to the extent that it is relevant. The ability to impeach a key prosecution witness and to admit her statements into evidence to that end is a critically important component of a fair trial and is the sine qua non of a meaningful right to confrontation and cross-examination. These rights are secured to the Defendants by the Fifth and Sixth Amendments. And, society too has a compelling interest in assuring a fair trial and meaningful confrontation. As in *Branzburg*, *Steelhammer* and *Shain*, the compelling law enforcement interest overrides the interest of the press where, as here, there is no remaining confidentiality and not even the suggestion of vexation. Thus, when the *LaRouche* balance is struck, it justifies disclosure of the Gauldin interview.[12]

---

*ing The Federal Common–Law Reporter's Privilege*, 17 SPG Comm.Law 1 (1999). Hence, that issue need not be addressed.

**12.** The same cannot be said of Ziliani's notes unless they contain either verbatim or substantially verbatim quotations from Gauldin. *See Cuthbertson I*, 630 F.2d at 148; *cf. United States v. Smith*, 31 F.3d 1294, 1302 n. 7 (4th Cir.1994)

## CONCLUSION

For the foregoing reasons, the Motion to Quash, filed by WTVR and Ziliani, is denied. The subpoena duces tecum shall be modified to require production of only the unedited videotape of the Gauldin interview, and any verbatim or substantially verbatim quotations of Gauldin made by Ziliani during the interview.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

---

(Notes taken by third parties during witness interviews may also qualify as a "statement" of the witness under § 3500(e)(2) [Jencks Act], if they are "substantially verbatim."). Nor can there be disclosure of notes made in the editing or writing process.